Devers-Scott v. Office of Professional Regulation (2005-481)

2007 VT 4

[Filed 12-Jan-2007]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.


 2007 VT 4

 No. 2005-481


 Roberta Rose Devers-Scott Supreme Court

 On Appeal from
 v. Washington Superior Court


 Office of Professional Regulation May Term, 2006


 Helen M. Toor, J.

 Lisa Chalidze of Lisa Chalidze, P.C., Benson, and Michael H. Sussman,
 Goshen, New York, for Plaintiff-Appellant.

 Edward G. Adrian, State Prosecuting Attorney, Montpelier, for
 Defendant-Appellee.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 ¶ 1. REIBER, C.J. Plaintiff Roberta Devers-Scott appeals a
 Washington Superior Court decision affirming a ruling by an administrative
 law officer (ALO) revoking Devers-Scott's license to practice midwifery. 
 She contends that: (1) the record does not support the ALO's findings; (2)
 the ALO erred in concluding that she violated certain unprofessional
 conduct statutes and midwifery rules; (3) she was stripped of her license
 based on her attitude and was thereby denied due process of law; and (4)
 the sanction imposed was too severe. We affirm.
 
 ¶ 2. The State filed a complaint with the Office of
 Professional Regulation (OPR) seeking immediate summary suspension of
 Devers-Scott's license to practice midwifery. The OPR conducted a summary
 suspension hearing, pursuant to 3 V.S.A. § 814(c). The results of that
 hearing were not reviewed by the superior court or by the ALO, and so are
 not considered herein. The issues raised on this appeal arise out of
 proceedings commenced when the state subsequently filed a specification of
 charges against Devers-Scott for alleged unprofessional conduct in
 connection with her care for three clients: A.B., L.S., and K.B. The
 specification of charges sought the permanent revocation of Devers-Scott's
 license to practice midwifery in Vermont, as contemplated by 26 V.S.A. §
 4188(c).

 ¶ 3. The OPR appointed an ALO to conduct a full hearing on the
 merits of the charges, pursuant to 3 V.S.A. §129(j) and 26 V.S.A. §
 4186(c). At that hearing, the burden of proof was on the State to show by
 a preponderance of the evidence that Devers-Scott had committed
 unprofessional conduct. 3 V.S.A. § 129a(c). The ALO conducted a seven-day
 hearing in late September 2004 and issued a ruling in December of that
 year. In that ruling, the ALO found that Devers-Scott had "committed
 multiple acts constituting unprofessional conduct," and that "[a]
 substantial number of those acts had implications for the care and safety
 of clients and their to-be-born children." The ALO further found that
 Devers-Scott had been reprimanded for unprofessional conduct in Vermont in
 2001 because of a 1996 indictment for practicing midwifery without a
 license in New York. Based on those findings, the ALO permanently revoked
 Devers-Scott's license to practice midwifery in Vermont. Devers-Scott
 appealed to the superior court, pursuant to 3 V.S.A. § 129(j). The
 superior court affirmed the ALO's decision on October 12, 2005. This
 appeal followed.

 I. Standard of Review

 ¶ 4. "Where there is an intermediate level of appeal from an
 administrative body, we review the case under the same standard as applied
 in the intermediate appeal." Tarrant v. Dep't of Taxes, 169 Vt. 189, 195,
 733 A.2d 733, 738 (1999). We therefore review the ALO's decision
 independent of the superior court's findings and conclusions. "The statute
 simply gives parties two appeals." In re Town of Sherburne, 154 Vt. 596,
 604, 581 A.2d 274, 278 (1990). 
 
 ¶ 5. The scope and character of our review of ALO and board
 decisions varies depending on the character of the proceedings below and
 the particular expertise of the fact-finder. See id. at 603-04, 733 A.2d at
 278 (citing Sierra Club v. Marsh, 769 F.2d 868, 871-72 (1st Cir. 1985))
 ("We should be more willing, or be less willing, to differ with a [trial]
 court about the 'reasonableness' or 'arbitrariness' of an agency decision,
 depending upon the particular features of the particular case that seem to
 make a more independent, or a less independent, appellate court scrutiny .
 . . appropriate."). Here, a nonexpert ALO issued findings of fact and
 conclusions of law after a seven-day hearing.

 ¶ 6. We affirm the factual findings of administrative tribunals when
 they are "supported by substantial evidence." Braun v. Bd. of Dental
 Exam'rs, 167 Vt. 110, 114, 702 A.2d 124, 126 (1997). "Evidence is
 substantial if, in looking at the whole record, it is relevant and a
 reasonable person could accept it as adequate." Id. (citation omitted). 
 This Court will not, upon its review of the evidence, reweigh conflicting
 evidence. Rather, we defer to the finder of fact when there is conflicting
 evidence in the record. In re Southview Assocs., 153 Vt. 171, 177-78, 569
 A.2d 501, 504 (1989). 
 
 ¶ 7. The State argues that we should afford the ALO's
 interpretation of the midwifery statutes and rules the same "ordinary
 deference" we gave to the Real Estate Commission in Office of Prof'l
 Regulation v. McElroy, 2003 VT 31, ¶ 7, 175 Vt. 507, 824 A.2d 567 (mem.). 
 In McElroy we held that the Real Estate Commission's conclusion that
 McElroy had engaged in a "continuing course of conduct" under a statute
 governing real-estate brokers was "entitled to ordinary deference . . .
 meaning that we will accord deference to the R.E.C.'s interpretation of the
 real estate statutes where it represents a permissible construction of the
 statutes." Id. We also noted in McElroy that "reviewing courts defer to an
 administrative agency's conclusions of law when these conclusions are
 'rationally derived from the findings and based on a correct interpretation
 of the law.' " Id. (quoting Braun, 167 Vt. at 114, 702 A.2d at 126). 

 ¶ 8. More recently, in State v. Brooks, we quoted the above-cited
 language from Braun when reviewing a decision of the Board of Land
 Surveyors, but noted that, because the board had "no special expertise" in
 resolving what was essentially a jurisdictional dispute, no "additional
 deference" was warranted. 2004 VT 88, ¶ 8, 177 Vt. 161, 861 A.2d 1096. 
 In Brooks, then, we deferred only to the board's findings of fact, and
 reviewed de novo its legal conclusion. Id. ¶¶ 9-17. In Brooks, we
 characterized our deference to board interpretations in Braun as arising
 from the Board's special expertise in, essentially, determining whether a
 fellow dentist had committed gross negligence within the statutory
 definition. Id. ¶ 8.

 ¶ 9. The question of how much deference a reviewing court should give
 to a nonexpert ALO is one of first impression in this state. The ALO in
 this case was an attorney and had no special expertise in midwifery, unlike
 the Board of Dental Examiners in Braun (composed of dentists) and the Board
 of Land Surveyors in Brooks (composed of surveyors). Accordingly, the
 ALO's interpretations of the midwifery statutes and rules are entitled to
 no deference and will be reviewed de novo. See Ayala-Chavez v. INS, 945
 F.2d 288, 294 (9th Cir. 1991) ("[A] reviewing court should defer to an
 administrative agency only in those areas where that agency has particular
 expertise. . . . Questions of law that can be answered with traditional
 tools of statutory construction are within the special expertise of courts,
 not agencies, and are therefore answered by the court de novo.") (internal
 quotations omitted), superseded by statute on other grounds as recognized
 in Arthurs v. INS, 959 F.2d 142, 143 (9th Cir. 1992).
 
 ¶ 10. As to sanctions, a board or ALO "has discretion to impose an
 appropriate sanction if there is a showing of unprofessional conduct." Bd.
 of Med. Practice v. Perry-Hooker, 139 Vt. 264, 269, 427 A.2d 1334, 1336
 (1981). We have also stated that we "will not interfere with the decision
 of an administrative board made in the performance of a discretionary duty
 in the absence of a showing of abuse of discretion." Vincent v. State Ret.
 Bd., 148 Vt. 531, 536, 536 A.2d 925, 929 (1987). We will examine a
 nonexpert ALO's sanction determination more closely than we would the same
 determination by an expert board. Cf. McElroy, 2003 VT 31, ¶ 7 (noting
 that, "because the R.E.C. is composed of realtors already having a Vermont
 license, the members of this regulatory board would not themselves be
 subject to the regulation that they were implementing," and the deference
 given to the sanctioning determination in Braun was not justified in
 McElroy).
 
 II. Discussion

 ¶ 11. We begin with a brief review of the regulations and statutes
 governing midwife licensing and discipline in Vermont. A board or ALO may
 revoke a professional license after a disciplinary hearing. 3 V.S.A.
 §129(6). The types of unprofessional conduct that warrant disciplinary
 action are described in 3 V.S.A. §129a. Subsection 129a(a) is mandatory;
 failure "to comply with provisions of federal or state statutes or rules
 governing the practice of the profession" shall be found to be
 unprofessional conduct. Id. § 129a(a)(3). In contrast, "[f]ailure to
 practice competently," evidenced by the "performance of unsafe or
 unacceptable . . . client care" or the "failure to conform to the essential
 standards of acceptable and prevailing practice" may constitute
 unprofessional conduct. Id. § 129a(b)(1), (2).
 
 ¶ 12. Pursuant to the statutory authority created by 26 V.S.A. §
 4185(b), Vermont has adopted the Administrative Rules for Licensed Midwives
 (MR or midwifery rules). 9 Code of Vermont Rules 04 030 360. The stated
 purpose of the rules is to "protect the public health, safety and welfare
 by setting standards, licensing applicants, and regulating licensed
 midwives and their practices." MR 1.1. Several of the midwifery rules are
 implicated in the current case. The substance of these rules is discussed
 below in regard to the specific violations. Under 3 V.S.A. § 129a(a), each
 time Devers-Scott violated a midwifery rule, she also committed
 unprofessional conduct.

 ¶ 13. Like the ALO and the superior court, we do not consider, with
 respect to any of the three patients, whether Devers-Scott's actions and
 omissions caused harm. (FN1) Such a determination is not necessary to a
 conclusion of unprofessional conduct under the rules and statutes involved
 here. 

 Patient A.B.
 
 ¶ 14. The pertinent facts as to patient A.B. are largely
 undisputed. In July of 2003, A.B. chose Devers-Scott to provide her with
 midwifery care. A.B. was due to deliver in early January of 2004. At an
 office visit on January 16, A.B. reported to Devers-Scott that she was
 leaking clear fluid from her vagina. A.B. also testified that she had
 reported leaking to Devers-Scott two other times before the January 16
 appointment. Devers-Scott reassured her that there was no cause for
 concern because, even if the fluids were amniotic, her body was replacing
 them. On the evening of January 17, A.B. called Devers-Scott to report a
 "small gush" of liquid. By the morning of January 18, A.B. was in active
 labor at her home. Devers-Scott arrived later that day. A.B. began
 pushing at approximately midnight on January 18 and did so until 7:40 a.m.
 on January 19 before Devers-Scott arranged for an ambulance to transport
 her to Rutland Hospital, where the baby was delivered by cesarean section. 
 At the time of the cesarean the obstetrician on call observed a large
 amount of very thick meconium in the uterine cavity, and no amniotic fluid. 
 The baby was cyanotic and not breathing when it was removed from the
 uterus. The ALO determined that Devers-Scott had violated several
 provisions of the rules and statutes governing the practice of midwifery
 prior to the delivery. We consider each violation in turn.

 ¶ 15. First, Devers-Scott argues that the ALO erred in finding that
 she violated MR 3.15, which requires: (A) that the midwife establish and
 maintain a record of the care provided and data gathered for each client,"
 and (B) that "[e]ach client's record must contain . . . [a] date for each
 entry in the prenatal record and the postpartum record, and a date and time
 for each entry in the labor record." The ALO found that Devers-Scott
 arrived at Rutland Hospital with an incomplete chart, that she completed
 the chart the following day based on notes written on scraps of paper and
 the recollections of herself and her assistant, and that the completed
 chart was deficient and contained numerous inaccuracies. Devers-Scott does
 not squarely contest those findings. Instead, she contends that, because
 the staff at Rutland Hospital never looked at the chart she prepared prior
 to the delivery, her record-keeping-however deficient it may have been-did
 not contribute to an adverse outcome. This contention, even if true, does
 not address the rules. Midwifery rule 3.15 requires that a labor record be
 maintained but contains no adverse-outcome condition. There is no evidence
 in the record to dispute the ALO's conclusion that Devers-Scott's labor
 chart did not meet the requirements set forth in the rule. There were ample
 findings supported by the record, including Devers-Scott's own admissions,
 supporting that conclusion. Devers-Scott's assistant also testified that
 she and Devers-Scott reconstructed the labor chart, largely from memory,
 the following day. The ALO's conclusion that Devers-Scott violated MR
 3.15(8) was not in error.
 
 ¶ 16. Second, Devers-Scott argues that the ALO erred in concluding
 that she violated MR 3.14.3, which requires midwives to transfer patients
 to the hospital or consult with a physician in certain enumerated
 situations. She supports this contention by pointing out that fluid
 discharge is not one of the fourteen triggers for transport specified in
 the rule. Devers-Scott misapprehends the ALO's conclusion. With respect to
 the fluid discharge, the ALO did not conclude that Devers-Scott had
 violated MR 3.14.3, but instead found that Devers-Scott violated 3 V.S.A. §
 129a(b)(1): failure to practice competently, evidenced by the performance
 of unsafe patient care.

 ¶ 17. The ALO found that A.B. had told Devers-Scott on three separate
 occasions that she was leaking clear fluid from her vagina, including a
 gush of fluid on January 17. He also found that, in response to these
 incidents, Devers-Scott did not consult a physician or conduct tests to
 determine whether the leak resulted from a rupture of the inner amniotic
 sac. Devers-Scott admitted that premature full rupture of the membranes
 can have adverse consequences for the baby and is a circumstance that
 necessitates consultation with a physician. In addition, in related
 findings, the ALO found that Devers-Scott encouraged A.B. to engage in
 sexual intercourse after the leaking began, on the theory that it might
 hasten labor, even though the introduction of foreign objects into the
 vagina can increase the likelihood of infection after the membrane has
 ruptured. All of these findings are amply supported by the record.
 
 ¶ 18. Devers-Scott does not directly contest the ALO's findings
 about the leaking, her failure to test the liquid, or the potentially
 serious consequences of an undiagnosed full rupture. She argues, instead,
 that because the conditions A.B. presented are not explicitly listed as
 triggers for a physician consultation in midwifery rule 3.14.3, there was
 no support for the ALO's conclusion that Devers-Scott should have consulted
 a physician. However, the ALO did not conclude that Devers-Scott violated
 MR 3.14.3 in this instance. Instead, the ALO concluded that, under the
 particular circumstances A.B. presented, 3 V.S.A. 129a(b)(1) requires that
 a midwife, "in the exercise of caution and in providing competent and safe
 patient care, . . . make the assumption that a full rupture of the amniotic
 membrane [has] occurred . . . . [because t]he risks of making the opposite
 assumption . . . are simply too high." The ALO further concluded that, in
 light of these risks, Devers-Scott should not have advised A.B. to have
 sexual intercourse, and that Devers-Scott should have consulted with a
 doctor. We find this conclusion reasonable, given the protective purposes
 of the midwifery statutes, their cautionary language, and the character of
 the evidence in the record concerning the leaking, the risk of infection,
 and the adverse consequences of undiagnosed premature rupture. 

 ¶ 19. Third, Devers-Scott contends that the ALO erred in concluding
 that she violated MR 3.14.3(b), which requires transportation or
 consultation upon evidence of a nonreassuring fetal heart rate. MR
 3.14.3(3). Her position is that the record does not support the ALO's
 finding that A.B.'s fetus experienced a nonreassuring heart pattern.

 ¶ 20. The record supports the ALO's finding. The State's expert
 midwife disputed Devers-Scott's contention that the fetal heart rates were
 reassuring. After reviewing the evidence, Ryan concluded that the baby was
 experiencing variable decelerations and that they were non-reassuring
 because they were not resolved by changing A.B.'s position and
 administering oxygen. In Ryan's opinion, those factors were serious enough
 to cause concern and to require transportation or, at a minimum,
 consultation with a doctor. The ALO's finding was supported by substantial
 credible evidence, and the ALO's conclusion that Devers-Scott violated MR
 3.14.3(3) was not error.
 
 ¶ 21. The ALO also concluded, on the basis of these facts, that
 Devers-Scott violated 3 V.S.A. § 129a(b), which defines as unprofessional
 conduct the "performance of unsafe or unacceptable patient . . . care" and
 the "failure to conform to the essential standards of acceptable and
 prevailing practice." The ALO's conclusion rested on his findings
 concerning fluid discharge over a period of days; the scant release of
 fluid when Devers-Scott severed the membranes with an amniohook; the
 observation of meconium; the baby's unresolved heart decelerations; the
 baby's lack of descent; the baby's position, which was incompatible with
 vaginal delivery; and A.B.'s swollen vulva, which indicated that she had
 been pushing for an extended period of time. Devers-Scott does not contest
 these findings, and they are supported by the record, as noted above.

 ¶ 22. Given the ALO's findings, and the additional support in the
 record, we conclude that the ALO did not err when he concluded that
 Devers-Scott's conduct during her care of A.B. constituted a "failure to
 conform to the essential standards of acceptable and prevailing practice,"
 which is unprofessional conduct under 3 V.S.A. § 129a(b).

 Patient L.S.

 ¶ 23. The facts relating to L.S. are also largely uncontested. In
 May of 2003, L.S. engaged Devers-Scott to provide midwifery care. She had
 previously had a cesarean section at Rutland Hospital and was dissatisfied
 with that experience. She made it clear to Devers-Scott that she did not
 wish to return to Rutland Hospital. L.S.'s domestic situation was
 unsettled, and her partner refused to allow her to have the birth at his
 house. Devers-Scott arranged with a midwife-in-training, Ms. Mulholland, to
 host the birth at her house in Pittsford, Vermont. 

 ¶ 24. There was some conflicting evidence regarding the specifics of
 the prenatal care provided: L.S. was due in mid-December of 2003. She
 attended an appointment at Devers-Scott's office on December 19. 
 Devers-Scott claims that L.S. then abandoned her care by missing the next
 two scheduled appointments. L.S. claims that Devers-Scott told her that no
 additional appointments were necessary because she would be going into
 labor very soon. The ALO did not make a specific finding about the
 importance of the missed appointments, but Devers-Scott did acknowledge
 that L.S. was already past her due date at the December 19 appointment. 
 The record shows that, after missing the two scheduled appointments in late
 December, L.S. called Devers-Scott on January 2 and left a message on the
 answering machine indicating that she was in labor. At that time, L.S. was
 post-mature, meaning that her pregnancy had exceeded forty-two weeks.
 Devers-Scott got the message, picked L.S. up at her home, and transported
 her to the Mulholland residence where L.S. labored for some hours. 
 
 ¶ 25. Devers-Scott eventually arranged for an ambulance to
 transport L.S. to Porter Hospital, where doctors delivered her baby by
 cesarean section. Upon delivery, the attending physician observed very
 thick meconium in the amniotic cavity, and noted that the umbilical cord
 and baby were meconium-stained, which indicates that meconium had been
 present for some time. The ALO found several instances of unprofessional
 conduct with respect to Devers-Scott's care of L.S. We consider them in
 turn.

 ¶ 26. The ALO found, and Devers-Scott concedes, that Devers-Scott
 committed unprofessional conduct by failing to obtain written informed
 consent forms from L.S., either for the home birth or for the special risks
 associated with a vaginal birth after cesarean (VBAC). These forms are
 required by MR 3.12 and 3.14.2.1(4) respectively. At the merits hearing
 Devers-Scott conceded that her failure to file them constituted
 unprofessional conduct. She now contends, however, that she did have oral
 informed consent from L.S., and dismisses the informed-consent provisions
 as mere paperwork violations. In contrast, the ALO found that the forms
 are not a mere formality. The ALO properly concluded that the rule
 requires a strictly-defined form of written consent for home births after a
 previous cesarean birth and there was ample support in the record,
 including Devers-Scott's own admission, that she did not complete or file
 the form as the rules require. See Appx. A, 9 Code of Vermont Rules 04 030
 360-23, 24. 
 
 ¶ 27. The midwifery model of care, cited by the ALO, is a
 foundation of the Vermont statutes and rules governing midwifery, and is
 premised on giving the mother power over the direction of her pregnancy and
 childbirth. Informed-consent documents are the method, required by rule,
 to ensure that the mother has received the information necessary to make a
 reasoned decision. That concept is especially critical in the VBAC
 context, which entails additional risks and thus requires additional
 safeguards. See id. (requiring prospective VBAC client to affirm that she
 has "thought about the danger to [her] baby and to [her] of uterine rupture
 . . . which may result in permanent brain damage, heavy bleeding, or in the
 death of [her] baby and/or [her]"). The VBAC informed-consent form also
 serves to assure prospective clients-and to remind midwives-that the other
 provisions of the midwifery rules must be complied with at the birth: it
 requires the client to affirm that "I understand that [my midwife] will be
 assisted by another licensed midwife and possibly by other health care
 professionals," that the "[b]irth place will be 30 minutes or less from an
 operating room" and that "I will complete pre-admission forms prior to my
 possible transfer to a hospital." Id. Devers-Scott was also charged with
 failing to comply with many of the same rules that the VBAC
 informed-consent form serves to reinforce, which highlights the substantive
 importance of the form. We therefore find no error in the ALO's conclusion
 that Devers-Scott committed unprofessional conduct by failing to obtain
 L.S.'s written informed consent for the VBAC. 

 ¶ 28. Devers-Scott next argues that the ALO erred when he concluded
 that her failure to consult with a physician about L.S. violated midwifery
 rules 3.14.2.1 and 3.14.2(2), and therefore was unprofessional conduct. 
 She supports this argument by claiming that L.S. abandoned her care by
 failing to appear for scheduled appointments. Because L.S. was no longer
 her patient, she reasons, she was not responsible for monitoring L.S.'s
 pregnancy. The first physician-consultation rule, MR 3.14.2.1, states
 that, with some exceptions not relevant here, "prenatal consultation is
 advised when available." Given the non-mandatory nature of MR 3.14.2.1, it
 appears that the ALO was merely citing it in support of his conclusion
 regarding MR 3.14.2(2). The latter rule mandates consultation where, as
 here, a woman reaches post-maturity (gestational age greater than forty-two
 weeks). MR 3.14.2(2). The ALO found that L.S. reached forty-two weeks in
 late December, and that Devers-Scott neglected to contact a physician
 between that time and when L.S. gave birth in early January. Devers-Scott
 does not contest the ALO's finding that L.S. reached post-maturity in late
 December. Nor does she claim to have made the required consultation.
 Therefore, the only issue is whether L.S. abandoned her care by missing the
 appointments, before the period of post-maturity, in late December.

 ¶ 29. The midwifery rules contain specific provisions governing
 discontinuation of services. See MR 3.13(F) ("Before refusing or
 discontinuing service, the midwife must notify the client in writing,
 provide the client with names of other licensed maternity care
 practitioners, and offer to provide copies of medical records promptly,
 regardless of whether copying costs have been paid by the client."). 
 Devers-Scott never informed L.S. that she thought L.S. had abandoned her
 care and that Devers-Scott was terminating their relationship, either
 orally or in writing. According to the record, L.S. last appeared for an
 appointment on December 19, at which time she was more than forty weeks
 pregnant, and almost one week past her due date. (FN2) Devers-Scott then
 picked L.S. up walking by the side of the road sometime before December 25,
 but did not inform her at that time that she was terminating L.S.'s care. 
 Sometime between December 25 and January 1, Devers-Scott claims she decided
 to terminate care and composed a letter informing L.S. of her decision, but
 never delivered the letter to L.S. When L.S. called on January 2,
 Devers-Scott did not inform her of the termination and arrange other care,
 but instead undertook to perform midwifery services. Furthermore, the ALO
 heard testimony from the State's expert that the proper way to terminate a
 midwife-client relationship would be to physically find the client and
 inform her of the situation. 
 
 ¶ 30. Even if we accepted Devers-Scott's argument that L.S.
 abandoned the relationship, Devers-Scott also did not take any steps to
 comply with rule 3.13(F)'s other requirements: providing the client with
 the names of other care providers and providing copies of medical records
 to those providers. Given the great weight of the evidence, and the fact
 that MR 3.13(F) unequivocally requires that a midwife notify a client in
 writing before terminating service, the ALO did not err in concluding that
 L.S. was still under Devers-Scott's care until at least January 2.
 Therefore, the ALO also did not err in concluding that Devers-Scott
 violated MR 3.14.2(2) by failing to consult with a physician when L.S.
 reached post-maturity in late December. 

 ¶ 31. Third, Devers-Scott claims that the ALO erred in finding that
 she violated MR 3.14.2.1(9) and (10), which require that "pre-admission
 forms . . . be completed for the client before labor, for the hospital to
 which the client may possibly be transferred" and that the client's
 prenatal records be sent to the backup hospital before birth. Devers-Scott
 first argues that L.S. terminated care by missing two meetings, thereby
 relieving Devers-Scott of her obligation to submit the pre-admission forms. 
 As discussed above, that argument is unavailing. Second, she claims that
 L.S.'s refusal to go to the closest hospital and the unsettled nature of
 L.S.'s planned birthing place made it impossible for her to determine where
 to deliver the pre-admission forms and prenatal records. But the ALO found
 that Devers-Scott and L.S. had agreed to go to Porter Hospital in
 Middlebury, and this finding was supported by Devers-Scott's own admission. 
 Therefore, Devers-Scott could have complied with MR 3.14.2.1(9) and (10) by
 delivering the pre-admission forms and prenatal records to Porter Hospital. 
 She concedes that she did not do so. Thus, the ALO's determination that
 Devers-Scott violated MR 3.14.2.1(9) and (10) was not error.
 
 ¶ 32. Fourth, Devers-Scott contends that the ALO erred in
 concluding that she violated MR 3.14.2.1(6), which requires that a home
 birthing site must be within 30 minutes "transport time" from the backup
 hospital. Devers-Scott argues that "transport time" should be construed to
 include only the time it takes the already-loaded ambulance to drive from
 house to hospital. The ALO construed "transport time" to encompass either:
 (1) the period beginning with the distress call, through the pickup, and
 ending when the patient is unloaded at the hospital, regardless of weather
 or other hindrances, or (2) the time from the ambulance's arrival at the
 house to the time the ambulance reaches the hospital. Even under the more
 permissive latter construction, the ALO concluded that Devers-Scott
 violated the rule by choosing Ms. Mulholland's residence as the birthing
 site when she knew that L.S. would be transported to the hospital in
 Middlebury. We review the ALO's construction of the rule de novo. Supra,
 ¶ 9; Ayala-Chavez, 945 F.2d at 294.

 ¶ 33. As this Court has previously stated, "[o]ur primary duty in
 construing a statute is to discern the intent of the [drafter] by examining
 the language of the entire statute, along with its purpose, effects, and
 consequences." State v. Lussier, 171 Vt. 19, 23, 757 A.2d 1017, 1020
 (2000). "Transport" is defined as "[t]o convey from one place to another."
 Webster's New University Dictionary1228 (1984). The VBAC informed-consent
 form also refers to transport time, requiring that the "[b]irth place will
 be 30 minutes or less from an operating room." Appx. A, 9 Code of Vermont
 Rules 04 030 360-23. Neither the dictionary definition nor the reference
 in the consent form resolves the question, which is complicated by the fact
 that an ambulance call requires the ambulance to come from another location
 to the birthing site before transporting the patient to the hospital. 
 
 ¶ 34. Where the language in a statute or rule is ambiguous, we turn
 to the underlying purpose of the rule to guide our interpretation. See SEC
 v. C.M. Joiner Leasing Corp., 320 U.S. 344, 350 (1943) ("[C]ourts will
 construe the details of an act in conformity with its dominating general
 purpose."); Clymer v. Webster, 156 Vt. 614, 625, 596 A.2d 905, 912 (1991). 
 The ALO appears to have done so here, concluding that the regulation,
 "intended for the safety of VBAC clients and their babies, may not be
 applied in a manner that undermines its protective intentions." The ALO
 concluded that, at a minimum, the rule should be interpreted to require
 that the time from the arrival of an ambulance at the house (or, if
 transporting by car, the time of the decision to transport) to arrival at
 the hospital, be less than 30 minutes. Further, the ALO noted, the time is
 not the actual time of transport on any given day, but rather "the
 reasonably expected time, given what the midwife must reasonably know
 and/or anticipate about weather conditions, the needs of the client and/or
 the risks (and prospects for) transport by car rather than via an ambulance
 call." 

 ¶ 35. Given the protective purposes of the midwifery rules
 generally, and the VBAC provisions specifically, we conclude that the ALO's
 interpretation of the rule is essentially correct. It is in accord with
 the legislative intent underlying the midwifery rules. See MR 1.1, 9 Code
 of Vermont Rules 04 030 360-2 ("The Director of the [OPR] has been given
 powers by Vermont law to protect the public health, safety, and welfare by
 setting standards, licensing applicants, and regulating licensed midwives
 and their practices."). We take this opportunity to state explicitly that
 the midwifery rules require that any VBAC home birthing site must be so
 situated that the reasonably expected time from the arrival of the
 ambulance at the house (or, if transporting by car, the decision to
 transport) and arrival at the hospital must be less than thirty minutes. 
 Based on this interpretation of the rule, the ALO concluded that
 Devers-Scott violated it. He found that under normal circumstances it
 would take a vehicle, once loaded, an average of twenty-eight minutes to
 get from the Mulholland residence to Porter Hospital, but that it took
 forty minutes on January 2 because of slippery winter conditions and time
 spent engaging the ambulance's four-wheel drive. He further found that it
 took about twenty minutes for the ambulance to arrive at the house after
 the call, and another twenty minutes to load the ambulance. The total time
 between the ambulance call and L.S.'s arrival at Porter Hospital was
 therefore eighty-one minutes. Devers-Scott testified that she could have
 driven from the birthing site to Porter Hospital in fifteen or twenty
 minutes, but did not do so for fear of hastening labor and necessitating
 delivery in the car. Notwithstanding this conflicting testimony, there was
 substantial support in the record for the above findings, which in turn
 supported the conclusion that Devers-Scott violated MR 3.14.2.1(6). We
 find no error.
 
 ¶ 36. Fifth, Devers-Scott argues that the ALO erred when he found
 that she violated MR 3.14.2.1(7), which requires that two licensed midwives
 be present at VBAC births. She again begins by arguing that L.S. abandoned
 her care, but as noted above, this argument is meritless. Furthermore,
 Devers-Scott admits that L.S. was under her care during the thirty-seventh
 week of pregnancy and that she should have arranged by then for a second
 midwife to be present at the birth. But Devers-Scott argues that the rule
 only requires two midwives "at birth" and not during labor, and that
 because delivery took place at the hospital she "did not violate the plain
 language of this rule." While we need not reach, under these facts, the
 question of precisely when during the labor-and-delivery process the second
 midwife must arrive, we reject Devers-Scott's hypertechnical reading. The
 obvious purpose of the rule is to require that two licensed midwives be
 present during the birthing process, i.e., during labor and delivery, not
 simply at the instant that the baby emerges from the birth canal. The
 circumstances of L.S.'s labor bear out the importance of having a second
 midwife present: had a second midwife been present to assist with a
 possible en-route birth, L.S. might have arrived at the hospital
 significantly sooner than she did, and the assistance of a second midwife
 could only have enhanced Devers-Scott's ability to keep good records of the
 care provided, as the rules require. 

 ¶ 37. The ALO found that Devers-Scott made no effort prior to January
 2 to get another midwife to assist, despite the passage of months when she
 thought the birth would occur at the Mulholland residence. Likewise, we
 observe nothing to suggest that, when she undertook to attend the labor and
 delivery, Devers-Scott sought help from any licensed midwife. As
 Devers-Scott does not contest the finding that she violated the rule, but
 only claims that the violation should be excused either because of the
 assertedly emergent circumstances of the birth, or based on her erroneous
 construction of the rule, we discern no error in the ALO's conclusion that
 the violation did occur.
 
 ¶ 38. Sixth, Devers-Scott contends that the ALO erred in concluding
 that Devers-Scott committed unprofessional conduct by failing to transfer
 L.S. promptly to the backup hospital. The ALO concluded that Devers-Scott
 should have initiated transport either immediately upon being contacted by
 L.S. on January 2, or later that day as soon as she saw any sign of
 meconium or elevated heart rate (tachycardia). Devers-Scott argues that
 none of the conditions found to be present by the ALO required immediate
 transfer of L.S. to a hospital. Midwifery rule 3.14.3 lists conditions
 which require immediate transfer or, if transfer is not possible,
 consultation with a doctor. Of the enumerated conditions, two are relevant
 here: (3) non-reassuring fetal heart rate, and (14) gross or thick meconium
 staining. Devers-Scott claims that she arranged for transport as soon as
 she became aware of the meconium and the accelerated heart rate. MR
 3.14.3. She also claims that the elevated fetal heart rates she recorded
 did not require transport because MR 3.14.3(3) requires transport only upon
 observation of a "[n]on-reassuring fetal heart rate or pattern" and only
 when that pattern persists for a longer time than the elevated heart rates
 did in the present case.
 
 ¶ 39. In contrast, the ALO found that both conditions were present
 for a substantial period of time before Devers-Scott arranged for
 transportation. There is substantial evidence in the record supporting his
 findings, and those findings support his conclusion. A witness testified
 to observing a "gush" of thick meconium coming out of L.S.'s vagina between
 5:00 p.m. and 6:00 p.m. Devers-Scott noted in the labor and delivery
 record that there was meconium at 6:30, but later characterized it as
 "clear to thin if even tinged fluid." During the cesarean section at
 Porter, the attending doctor observed thick meconium at the entry to the
 amniotic cavity and meconium staining of the placenta and umbilical cord. 
 There was testimony that such staining typically indicates that meconium
 has been present in the amniotic fluid for eighteen to twenty-four hours. 
 The attending doctor at the birth did not see any visible meconium when
 performing an initial vaginal examination, however. Devers-Scott claims
 that she decided to transport at 6:30, between thirty and ninety minutes
 after Mulholland observed the meconium. However, the emergency medical
 service's records reflect that Devers-Scott did not call them until 7:04
 p.m.

 ¶ 40. Likewise, the ALO found that the fetal heart rate exceeded 160,
 which is tachycardic, for approximately ninety minutes before Devers-Scott
 called an ambulance. Tachycardia is one of the non-reassuring fetal heart
 conditions listed in MR 3.14.3(3) that require the midwife to facilitate
 transfer or consult a doctor. There is evidence in the record that the
 fetal heart rate exceeded 160 for at least ninety minutes before
 Devers-Scott called for transport. The labor-and-delivery record contains
 entries at fifteen-minute intervals; the recorded heart rates were between
 136 and 146 beats per minute (bpm) until 5:15 p.m., at which time the
 recorded rate increased to 158 bpm. The rate then increased to 162 bpm at
 5:30, and remained above 160 until Devers-Scott stopped recording at 6:30. 
 The ambulance call was made at approximately 7:04 p.m. The evidence
 therefore suggests that between 90 and 105 minutes elapsed between the
 onset of tachycardia and the ambulance call. An expert midwife testified
 that such a prolonged rise in heart rate would be of great concern, and
 that transport should have been arranged earlier. As noted above, there
 was also substantial evidence in the record supporting the conclusion that
 there was sufficient meconium present to require earlier transport. Thus,
 the ALO did not err when he found that Devers-Scott violated MR 3.14.3(3)
 and 3.14.3(14).
 
 ¶ 41. Seventh, Devers-Scott contends that she should be excused
 from compliance with the transfer requirements in MR 3.14.3 because L.S.
 abandoned her care after the December 19 appointment. Because the ALO was
 correct in concluding that L.S. was still Devers-Scott's patient until
 January 2, however, this contention provides no basis for excusing
 Devers-Scott from the transfer requirements. Finally, Devers-Scott would
 have us find error in the ALO's conclusion that she should have arranged to
 transport L.S. sooner because L.S. had a "higher-risk or potentially more
 complicated" pregnancy triggering the general transport provision of MR
 3.14.3. In light of our conclusion that the ALO was correct in concluding
 that Devers-Scott committed unprofessional conduct by failing to transport
 in timely response to the meconium and tachycardia, however, we need not
 reach this question. 

 ¶ 42. Devers-Scott does not dispute the ALO's finding that she
 violated MR 3.15, which requires that a midwife "establish and maintain a
 record of the care provided and data gathered for each client." The ALO
 found that information regarding both fetal heart tones-as required by MR
 3.14.2.1(5)-and L.S.'s consent to the rupturing of her membranes was
 missing from the labor record. There was substantial support in the record
 for these findings.

 ¶ 43. We also find no error in the ALO's conclusion that Devers-Scott
 violated MR 3.14.2(2), which requires that, when a patient has reached a
 gestational age of forty-two weeks and is therefore deemed post-mature, the
 midwife "must consult with a licensed M.D. or D.O., must document such
 consultation and the consultant's recommendations, and must document
 discussion of the consultation with the client." The ALO found that L.S.
 reached postmaturity in late December and that Devers-Scott did not call a
 physician at that time. Apart from her general contention that her
 violation of this rule is excused by L.S.'s purported abandonment of
 Devers-Scott's care, Devers-Scott does not contest these findings. As
 noted above, the abandonment argument fails, and we therefore find no
 error.

 Patient K.B.
 
 ¶ 44. In late 2002, K.B. engaged Devers-Scott to provide midwifery
 services for the birth of her child. At that time, K.B. lived in Cohoes,
 New York. The arrangement, as K.B. understood it, was that she would have
 a home birth, and that Devers-Scott would be in attendance. Devers-Scott
 was not licensed to practice midwifery in New York, nor has she ever been.
 During the months leading up to the delivery, Devers-Scott made one visit
 to K.B.'s home in New York. K.B. also took some herbs in New York, on
 Devers-Scott's advice, in February 2003. K.B. traveled to Devers-Scott's
 office in Vermont for all of the other consultations. K.B. also entered
 into an agreement with Devers-Scott to rent a birthing tub. The rental
 agreement indicated that the tub would be used at K.B.'s home in New York.


 ¶ 45. Devers-Scott contends that the birth location was unsettled
 until the time K.B. decided not to continue in Devers-Scott's care. On
 February 17, 2003, K.B. began early labor and called Devers-Scott to
 request delivery of the birthing tub (which was then being used by another
 woman). About fifteen minutes later, K.B. received a call back from
 Devers-Scott. During this conversation, Devers-Scott informed K.B. that
 she was terminating her midwifery care. She did not provide K.B. with the
 names of other midwives. K.B. then arranged with another midwife she had
 used previously in Vermont to attend her labor and delivery at the hospital
 in Bennington, Vermont. Devers-Scott faxed K.B.'s records to the new
 midwife the next morning. After her labor did not progress, K.B. delivered
 her baby by cesarean section later that month. 

 ¶ 46. The ALO concluded that Devers-Scott committed unprofessional
 conduct by practicing midwifery without a license in New York and by
 improperly terminating K.B.'s care. Devers-Scott first challenges the
 ALO's finding that she violated the unprofessional conduct statutes by
 practicing midwifery without a license in New York. 3 V.S.A. § 129a(a)(3).
 She contends that: (1) there was no evidence that she ever held herself out
 to practice midwifery in New York; (2) she and K.B. discussed the
 possibility of having the birth at Devers-Scott's house in Vermont; and (3)
 K.B.'s birth ultimately did take place in Vermont, albeit under the
 supervision of a different medical team. In contrast, the ALO found that
 Devers-Scott was not licensed to practice midwifery in New York and that
 she "engaged in midwifery practice and referred to herself as a midwife in
 New York." He also found that New York law in 2003 required any person
 practicing midwifery, or using the title "midwife" in New York to be
 licensed or exempt from licensing. N.Y. Educ. Law § 6952 (2006) ("Only a
 person licensed or exempt under this article or authorized by any other
 section of law shall practice midwifery."); id. § 6953 ("Only a person
 licensed or exempt under this article shall use the title 'midwife.' ").
 Devers-Scott was not exempt from licensing in New York. See Id. § 6957
 (exempting physicians and supervised medical and midwifery students from
 the licensing requirement). Vermont law provides that practicing midwifery
 in violation of any state or federal statute shall constitute
 unprofessional conduct. 3 V.S.A. §129a(a)(3).

 ¶ 47. Once again, we find that the record supports the ALO's
 findings. The midwifery regulations address prenatal care, not merely
 procedures for labor and delivery. Therefore, evidence of Devers-Scott's
 visit to K.B.'s home in New York, which included taking K.B.'s blood
 pressure and fetal heart tones, supports the ALO's finding that
 Devers-Scott practiced midwifery in New York in violation of New York law. 
 The ALO's finding is further buttressed by K.B.'s testimony that she was
 under the impression that the birth would occur at her home in New York,
 and by the contract for the birthing tub, which included a provision that
 the tub was to be used in K.B.'s home in New York. There is ample evidence
 that Devers-Scott practiced midwifery in New York in violation of New York
 law, and the ALO correctly interpreted the law to bar unlicensed prenatal
 midwifery care. Therefore, the ALO's conclusion that she violated 3 V.S.A.
 § 129a(a)(3) was not in error.
 
 ¶ 48. Devers-Scott next disputes the ALO's conclusion that she
 violated MR 3.13(F) when she terminated K.B.'s care. That rule requires
 that a midwife, before she terminates care, "notify the client in writing,
 provide the client with names of other licensed maternity care
 practitioners, and offer to provide copies of medical records promptly." 
 The ALO found that Devers-Scott terminated K.B's midwifery care over the
 phone on February 17, 2003, and that she did not provide the names of other
 midwives. He also found that K.B. was in labor, probably early labor, at
 that time. Devers-Scott does not contest the ALO's finding that she
 terminated care over the phone, and does not claim to have provided the
 names of alternate care providers, but argues that K.B. relieved her of
 those responsibilities by preemptively selecting another care provider
 herself. We do not agree.


 ¶ 49. Midwifery rule 3.13(F) requires that, "[b]efore refusing or
 discontinuing service, the midwife must notify the client in writing."
 (Emphasis added.) The record supports the ALO's finding that Devers-Scott
 failed to notify K.B. of the termination in writing before terminating
 care. Likewise, K.B.'s proactive choice of a new care provider does not
 excuse Devers-Scott's failure to provide K.B. with the names of other care
 providers, particularly given that K.B. was already experiencing early
 labor and thus needed to make other arrangements quickly. Had Devers-Scott
 complied with the rule, this task would have been accomplished more
 directly. The ALO's determination that Devers-Scott violated MR 3.13(F) was
 not error.

 ¶ 50. Devers-Scott next argues that the ALO erred in his conclusion
 that she violated MR 3.14.3 which states that "[i]f birth is imminent, the
 midwife must not leave until the ambulance has arrived." Devers-Scott's
 position is that the rule did not apply because birth was not imminent; as
 she points out, over this interval, K.B. was twice sent home from the
 hospital and did not give birth until more than a week later. We disagree. 
 The ALO found that once labor commences, the birth of a child is imminent
 for purposes of MR 3.14.3. He based this finding on testimony by one of
 the State's midwifery experts, Ruth Richardson. The actual date of K.B.'s
 eventual delivery is not determinative of when birth was "imminent" for
 purposes of MR 3.14.3. The record supports the ALO's finding that it is not
 possible to predict in advance the interval between the onset of labor and
 the delivery of the baby and that the interpretation of the word "imminent"
 must account for that uncertainty. Therefore we cannot say that the ALO
 incorrectly construed the rule when he concluded that birth is imminent and
 triggers the requirements of MR 3.14.3 once labor commences. The ALO's
 finding that Devers-Scott violated MR 3.14.3 was not error.
 
 The Sanction

 ¶ 51. Pursuant to 3 V.S.A. § 129, sanctions may be imposed on a
 midwife for unprofessional conduct. Section 129(a)(3) allows the board or
 ALO to "revoke, limit, condition or prevent renewal of licenses" either
 permanently after a full hearing or temporarily after a summary suspension
 hearing. Devers-Scott's license was permanently revoked by the ALO, and
 the revocation was affirmed by the superior court. (FN2) 

 ¶ 52. Devers-Scott's basic complaint is that the nature of her
 violations do not justify the ALO's choice of sanction. She first argues
 that her "actions and omissions did not violate the midwifery rules except
 with regard to record keeping." However, as detailed above, Devers-Scott
 committed numerous violations, of both record-keeping and other rules and
 statutes. Additionally, Devers-Scott is mistaken in her belief that the
 record-keeping statutes and rules are less significant than other statutes
 and rules. The structure of the midwifery regulatory regime, and the ALO's
 findings, clearly demonstrate that diligent and accurate record-keeping and
 data-sharing are crucial to the safety of patients and to the legitimacy of
 midwifery practice. Dismissing the record-keeping requirements as merely
 ministerial ignores their underlying purposes. 
 
 ¶ 53. To cite one example, during her care of L.S., Devers-Scott
 violated MR 3.14.2.1(10), which requires transmission of prenatal records
 to the backup health center before labor in VBAC cases. This rule,
 although it involves the transmission of records, was plainly drafted to
 ensure that emergency caregivers have the information necessary to
 providing the best possible care under rapidly changing and emergent
 circumstances requiring immediate action, such as those present in the case
 of L.S. The remainder of the record-keeping rules, similarly, impose
 record-keeping requirements on midwives in the service of the broader
 purposes of the rules, such as empowering mothers to make informed
 decisions about the direction of their care.

 ¶ 54. Devers-Scott makes two further arguments against the license
 revocation. First, she claims that her sanction was disproportionate to
 the sanction in In re Luce, Case No. 01-9001 (2003), in which she asserts
 the violations were more serious. Second, Devers-Scott continues to press
 the argument that L.S. "abandoned [Devers-Scott's] care," thereby releasing
 Devers-Scott from continued compliance with the law with respect to L.S.'s
 care and undermining the ALO's authority to revoke Devers-Scott's license. 
 That argument remains unavailing. Similarly, the facts in Luce are not
 helpful to Devers-Scott. In Luce, the midwife admitted to committing
 unprofessional conduct by allowing her client to labor for eighteen hours
 without progress, neglecting to address various physical manifestations of
 client distress, and failing to test for preeclampsia. The midwife in Luce
 agreed to waive her right to a hearing before an ALO in exchange for her
 acceptance of peer supervision for ten births, re-training, and remedial
 study.
 
 ¶ 55. Luce is not persuasive for three reasons. First, Luce
 involved three instances of unprofessional conduct with a single patient. 
 Devers-Scott's case comprises many more instances involving three patients.
 Second, and more important, the procedural posture of Luce is quite
 different from the case at bar. The State agreed to the Luce stipulations
 before an ALO made any findings. Therefore, there is no record of the facts
 on which the choice of sanction was based in Luce. A stipulated consent
 order is not persuasive precedent for a contested case such as this one. 
 We have held as much in an analogous criminal context. State v. Davis,
 155 Vt. 417, 420, 584 A.2d 1146, 1147 (1990) (stating that plea-bargained
 and judge-determined sentences cannot be compared). Third, and most
 important, this Court has long held that in regard to professional conduct
 decisions, "each case must be resolved in the light of all its own
 circumstances, and except in the broadest sorts of policy concerns, there
 is no precedential value as between cases." In re Harrington, 134 Vt. 549,
 552, 367 A.2d 161, 163 (1976). Courts from other jurisdictions have reached
 similar conclusions with respect to professional license sanctions. See
 Aldrete, M.D. v. Dep't of Health Bd. of Med., 879 So.2d 1244, 1246-7 (Fla.
 Dist. Ct. App. 2004) ("Penalty imposition is a complex task . . . . 
 Ultimately, the decision rests within the Board's sound discretion. We
 cannot say on appeal that [the physician's] penalty was excessive based on
 the allegation that others, in [the physician's] opinion, received more
 favorable treatment."). Although we will not defer to sanction
 determinations by nonexpert ALOs, to the same extent as we do to those
 imposed by expert boards, even that more searching review reveals no error
 here. 

 ¶ 56. Devers-Scott also contends that the ALO erred by taking her
 troubled relationship with physicians and her demeanor into account in his
 consideration of sanction. The ALO's order does characterize Devers-Scott's
 "approach to the accusations against her" as giving rise to "questions
 about her forthrightness in dealings with clients and others in the health
 care profession." The ALO noted that Devers-Scott "denied many of the
 allegations in technical terms; . . . sought to blame clients or the
 obstetrical profession for [her own behaviors]" and concluded that, "in
 [his] view, her demeanor did not evidence a professional who was willing to
 accept responsibility for her actions." On review of the hearing
 transcripts, we note that there is ample support for these
 characterizations; Devers-Scott evinced little appreciation for the serious
 nature of her acts and omissions, and repeatedly sought to deflect blame
 onto her clients and others. These are proper considerations in
 determining sanctions in this case, as they are in the criminal context. 
 See State v. Sims, 158 Vt. 173, 188-89, 608 A.2d 1149, 1158 (1992). 
 Further, even if there were no support for the ALO's findings concerning
 Devers-Scott's attitude, the ALO's choice of sanction is abundantly
 supported by Devers-Scott's repeated failure to comply with the statutes
 and rules governing her profession.
 
 ¶ 57. Devers-Scott next argues that, because the statute does not
 contain guidelines for the imposition of sanctions, the ALO's decision is
 necessarily arbitrary. We disagree. The plain language of the
 unprofessional conduct statutes makes clear that the Legislature intended
 to leave the determination of the appropriate sanction to the discretion of
 the ALO. See 26 V.S.A. § 4188(c) ("After a hearing, and upon a finding of
 unprofessional conduct, an [ALO] may take disciplinary action against a
 licensed midwife or applicant."); 3 V.S.A. § 129(j) (ALO to hear
 disciplinary matters involving midwives and other professionals governed by
 advisor appointees); Id. § 129(a)(3) (board or ALO may "suspend, revoke,
 limit, condition or prevent renewal of licenses"). The legislature
 explicitly contemplated that, in appropriate cases, an ALO might revoke a
 midwife's license. 

 ¶ 58. Devers-Scott's citation of In re Taylor, in which we upheld a
 six-month license suspension for an attorney whose repeated failures to pay
 child support resulted in a misdemeanor conviction for nonsupport, is
 inapposite. 171 Vt. 640, 641, 768 A.2d 1273, 1275 (2000). To the limited
 extent that any attorney-misconduct case could inform our analysis of the
 ALO's sanction here, Taylor is not that case. The respondent in Taylor
 committed acts that did not directly involve his clients, in contrast to
 Devers-Scott's actions, which not only involved patients but directly and
 detrimentally affected the care they received. 
 
 ¶ 59. Finally, Devers-Scott claims that the ALO's decision denied
 her due process because she received no notice that the ALO would take her
 demeanor into account in his consideration of sanction. This contention is
 without merit. It is true that due process requires that a defendant
 receive notice of the charges against her. In this case, however,
 Devers-Scott admits that she did have notice that the OPR was charging her
 with violations of the unprofessional conduct statutes and the midwifery
 rules. She cites no case in which we required a judge or administrative
 agency to notify the defendant of every factor that might be taken into
 account in determining a discretionary sanction. In fact, we require only
 that a defendant has notice of the evidence and an opportunity to rebut.
 See Perry-Hooker, 139 Vt. at 269, 427 A.2d at 1336-37 ("[T]he appellant
 should have the opportunity to produce any evidence relevant to the issue
 of what sanction should be imposed."). All of the evidence on which the
 ALO based his decision was presented in open hearings, and Devers-Scott
 does not contend that she was denied an opportunity to contest it. 
 Therefore, the ALO did not violate Devers-Scott's due process rights in his
 imposition of sanction.

 ¶ 60. In sum, the record not only substantially supports, but
 virtually compels, the conclusion that Devers-Scott repeatedly engaged in
 unprofessional conduct and provided substandard care to her patients. 
 There is ample credible support in the record for the ALO's further
 conclusion that Devers-Scott's approach to the accusations itself raised
 doubts about her future ability to comply with the midwifery rules, the
 reach of which she has consistently sought to escape through hypertechnical
 constructions at odds with the rules' protective purposes. The sanction
 imposed was rationally devised to further the state's interest in
 protecting the health and safety of expectant mothers and unborn children.
 Thus, we conclude that the revocation of Devers-Scott's license was an
 appropriate exercise of the ALO's discretion. 

 Affirmed. 

 FOR THE COURT:


 _______________________________________
 Chief Justice


------------------------------------------------------------------------------
 Footnotes


FN1. Devers-Scott makes much of her claim that there has been no showing,
 either before the ALO or on appeal, that her actions caused adverse
 outcomes. Devers-Scott claims, principally, that the ALO's conclusion that
 her conduct "had implications for the care and safety of clients and their
 to-be-born children," was unsupported by the findings. The ALO, however,
 explicitly declined to conclude that Devers-Scott's actions were the legal
 cause of harms suffered by Devers-Scott's patients or their babies. The
 conclusion Devers-Scott focuses on, read in light of that disclaimer, is
 amply supported by the findings and the record: the ALO merely meant to
 emphasize that Devers-Scott's violations of the midwifery rules and other
 standards of care were not merely record-keeping or de minimis
 transgressions, as Devers-Scott has claimed.

FN2. Devers-Scott's briefing before this Court repeatedly misstates the
 record on appeal, stating that L.S. was "about 37.5 weeks" pregnant at the
 December 19, 2003, appointment and that "the patient had deprived
 Devers[-Scott] of the opportunity to care for her during the last 4 and
 one-half weeks of her pregnancy." Devers-Scott's own testimony and records
 reflect, however, that L.S. was due on December 14, 2003, and was more than
 forty weeks pregnant at the December 19 appointment with Devers-Scott. 
 L.S. went into labor on January 2, 2004, two weeks after the December 19
 appointment, not "4 and one-half weeks" or "several weeks" later, as
 Devers-Scott's briefing now asserts.

FN3. Devers-Scott's license was first temporarily suspended after the
 summary suspension hearing, which is not the subject of this appeal.