2007 VT 4

## Roberta Rose Devers-Scott v. Office of Professional Regulation

[918 A.2d 230]

No. 05-481

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed January 12, 2007

*Lisa Chalidze* of *Lisa Chalidze, P.C.*, Benson, and *Michael H. Sussman*, Goshen, New York, for Plaintiff-Appellant.

*Edward G. Adrian*, State Prosecuting Attorney, Montpelier, for Defendant-Appellee.

¶ 1. **Reiber, C.J.** Plaintiff Roberta Devers-Scott appeals a Washington Superior Court decision affirming a ruling by an administrative law officer (ALO) revoking Devers-Scott's license to practice midwifery. She contends that: (1) the record does not support the ALO's findings; (2) the ALO erred in concluding that she violated certain unprofessional conduct statutes and midwifery rules; (3) she was stripped of her license based on her attitude and was thereby denied due process of law; and (4) the sanction imposed was too severe. We affirm.

¶ 2. The State filed a complaint with the Office of Professional Regulation (OPR) seeking immediate summary suspension of Devers-Scott's license to practice midwifery. The OPR conducted a summary suspension hearing, pursuant to 3 V.S.A. § 814(c). The results of that hearing were not reviewed by the superior court or by the ALO, and so are not considered herein. The issues raised on this appeal arise out of proceedings commenced when the State subsequently filed a specification of charges against Devers-Scott for alleged unprofessional conduct in connection with her care for three clients: A.B., L.S., and K.B. The specification of charges sought the permanent revocation of Devers-Scott's license to practice midwifery in Vermont, as contemplated by 26 V.S.A. § 4188(c).

¶ 3. The OPR appointed an ALO to conduct a full hearing on the merits of the charges, pursuant to 3 V.S.A. § 129(j) and 26 V.S.A. § 4186(c). At that hearing, the burden of proof was on the State to show by a preponderance of the evidence that Devers-Scott had committed unprofessional conduct. 3 V.S.A. § 129a(c). The ALO conducted a seven-day hearing in late September 2004 and issued a ruling in

December of that year. In that ruling, the ALO found that Devers-Scott had "committed multiple acts constituting unprofessional conduct," and that "[a] substantial number of those acts had implications for the care and safety of clients and their to-be-born children." The ALO further found that Devers-Scott had been reprimanded for unprofessional conduct in Vermont in 2001 because of a 1996 indictment for practicing midwifery without a license in New York. Based on those findings, the ALO permanently revoked Devers-Scott's license to practice midwifery in Vermont. Devers-Scott appealed to the superior court, pursuant to 3 V.S.A. § 129(j). The superior court affirmed the ALO's decision on October 12, 2005. This appeal followed.

## I. Standard of Review

¶ 4. "Where there is an intermediate level of appeal from an administrative body, we review the case under the same standard as applied in the intermediate appeal." *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 195, 733 A.2d 733, 738 (1999). We therefore review the ALO's decision independent of the superior court's findings and conclusions. "The statute simply gives parties two appeals ...." *In re Town of Sherburne*, 154 Vt. 596, 604, 581 A.2d 274, 278 (1990).

¶ 5. The scope and character of our review of ALO and board decisions varies depending on the character of the proceedings below and the particular expertise of the fact-finder. See *id.* at 603-04, 733 A.2d at 278 (citing *Sierra Club v. Marsh*, 769 F.2d 868, 871-72 (1st Cir. 1985)) ("We should be more willing, or be less willing, to differ with a [trial] court about the 'reasonableness' or 'arbitrariness' of an agency decision, depending upon the particular features of the particular case that seem to make a more independent, or a less independent, appellate court scrutiny ... appropriate."). Here, a nonexpert ALO issued findings of fact and conclusions of law after a seven-day hearing.

¶ 6. We affirm the factual findings of administrative tribunals when they are "supported by substantial evidence." *Braun v. Bd. of Dental Exam'rs*, 167 Vt. 110, 114, 702 A.2d 124, 126 (1997). "Evidence is substantial if, in looking at the whole record, it is relevant and a reasonable person could accept it as adequate ...." *Id.* (citation omitted). This Court will not, upon its review of the evidence, reweigh conflicting evidence. Rather, we defer to the finder of fact when there is conflicting evidence in the record. *In re Southview Assocs.*, 153 Vt. 171, 177-78, 569 A.2d 501, 504 (1989).

¶ 7. The State argues that we should afford the ALO's interpretation of the midwifery statutes and rules the same "ordinary deference" we

gave to the Real Estate Commission in *Office of Professional Regulation v. McElroy*, 2003 VT 31, ¶ 7, 175 Vt. 507, 824 A.2d 567 (mem.). In *McElroy* we held that the Real Estate Commission's conclusion that McElroy had engaged in a "continuing course of conduct" under a statute governing real estate brokers was "entitled to ordinary deference . . . meaning that we will accord deference to the R.E.C.'s interpretation of the real estate statutes where it represents a permissible construction of the statutes." *Id.* We also noted in *McElroy* that "reviewing courts defer to an administrative agency's conclusions of law when these conclusions are 'rationally derived from the findings and based on a correct interpretation of the law.'" *Id.* (quoting *Braun*, 167 Vt. at 114, 702 A.2d at 126).

¶ 8. More recently, in *State v. Brooks*, we quoted the above-cited language from *Braun* when reviewing a decision of the Board of Land Surveyors, but noted that, because the board had "no special expertise" in resolving what was essentially a jurisdictional dispute, no "additional deference" was warranted. 2004 VT 88, ¶ 8, 177 Vt. 161, 861 A.2d 1096. In *Brooks*, then, we deferred only to the board's findings of fact, and reviewed de novo its legal conclusion. *Id.* ¶¶ 9-17. In *Brooks*, we characterized our deference to board interpretations in *Braun* as arising from the Board's special expertise in, essentially, determining whether a fellow dentist had committed gross negligence within the statutory definition. *Id.* ¶ 8.

¶ 9. The question of how much deference a reviewing court should give to a nonexpert ALO is one of first impression in this state. The ALO in this case was an attorney and had no special expertise in midwifery, unlike the Board of Dental Examiners in *Braun* (composed of dentists) and the Board of Land Surveyors in *Brooks* (composed of surveyors). Accordingly, the ALO's interpretations of the midwifery statutes and rules are entitled to no deference and will be reviewed de novo. See *Ayala-Chavez v. INS*, 945 F.2d 288, 294 (9th Cir. 1991) ("[A] reviewing court should defer to an administrative agency only in those areas where that agency has particular expertise. . . . Questions of law that can be answered with traditional tools of statutory construction are within the special expertise of courts, not agencies, and are therefore answered by the court de novo.") (internal quotations omitted), *superseded by statute on other grounds as recognized in Arthurs v. INS*, 959 F.2d 142, 143 (9th Cir. 1992).

■ ¶ 10. As to sanctions, a board or ALO "has discretion to impose an appropriate sanction if there is a showing of unprofessional conduct." *Bd. of Med. Practice v. Perry-Hooker*, 139 Vt. 264, 269, 427 A.2d 1334, 1336 (1981). We have also stated that we "will not interfere with the decision of an administrative board made in the performance of a discretionary duty in the absence of a showing of abuse of discretion." *Vincent v. Vermont State Ret. Bd.*, 148 Vt. 531, 536, 536 A.2d 925, 929 (1987). We will examine a nonexpert ALO's sanction determination more closely than we would the same determination by an expert board. Cf. *McElroy*, 2003 VT 31, ¶ 7 (noting that, "because the R.E.C. is composed of realtors already having a Vermont license, the members of this regulatory board would not themselves be subject to the regulation that they were implementing," and the deference given to the sanctioning determination in *Braun* was not justified in *McElroy*).

## II. Discussion

¶ 11. We begin with a brief review of the regulations and statutes governing midwife licensing and discipline in Vermont. A board or ALO may revoke a professional license after a disciplinary hearing. 3 V.S.A. § 129(a)(3). The types of unprofessional conduct that warrant disciplinary action are described in 3 V.S.A. § 129a. Subsection 129a(a) is mandatory; failure "to comply with provisions of federal or state statutes or rules governing the practice of the profession" shall be found to be unprofessional conduct. *Id.* § 129a(a)(3). In contrast, "[f]ailure to practice competently," evidenced by the "performance of unsafe or unacceptable . . . client care" or the "failure to conform to the essential standards of acceptable and prevailing practice" may constitute unprofessional conduct. *Id.* § 129a(b)(1), (2).

■ ¶ 12. Pursuant to the statutory authority created by 26 V.S.A. § 4185(b), Vermont has adopted the Administrative Rules for Licensed Midwives (MR or midwifery rules). 9 Code of Vermont Rules 04 030 360. The stated purpose of the rules is to "protect the public health, safety and welfare by setting standards, licensing applicants, and regulating licensed midwives and their practices." MR 1.1. Several of the midwifery rules are implicated in the current case. The substance of these rules is discussed below in regard to the specific violations. Under 3 V.S.A. § 129a(a), each time Devers-Scott violated a midwifery rule, she also committed unprofessional conduct.

¶ 13. Like the ALO and the superior court, we do not consider, with respect to any of the three patients, whether Devers-Scott's actions and omissions caused harm.[1] Such a determination is not necessary to a conclusion of unprofessional conduct under the rules and statutes involved here.

## Patient A.B.

¶ 14. The pertinent facts as to patient A.B. are largely undisputed. In July of 2003, A.B. chose Devers-Scott to provide her with midwifery care. A.B. was due to deliver in early January of 2004. At an office visit on January 16, A.B. reported to Devers-Scott that she was leaking clear fluid from her vagina. A.B. also testified that she had reported leaking to Devers-Scott two other times before the January 16 appointment. Devers-Scott reassured her that there was no cause for concern because, even if the fluids were amniotic, her body was replacing them. On the evening of January 17, A.B. called Devers-Scott to report a "small gush" of liquid. By the morning of January 18, A.B. was in active labor at her home. Devers-Scott arrived later that day. A.B. began pushing at approximately midnight on January 18 and did so until 7:40 a.m. on January 19 before Devers-Scott arranged for an ambulance to transport her to Rutland Hospital, where the baby was delivered by cesarean section. At the time of the cesarean the obstetrician on call observed a large amount of very thick meconium in the uterine cavity, and no amniotic fluid. The baby was cyanotic and not breathing when it was removed from the uterus. The ALO determined that Devers-Scott had violated several provisions of the rules and statutes governing the practice of midwifery prior to the delivery. We consider each violation in turn.

---

[1] Devers-Scott makes much of her claim that there has been no showing, either before the ALO or on appeal, that her actions caused adverse outcomes. Devers-Scott claims, principally, that the ALO's conclusion that her conduct "had implications for the care and safety of clients and their to-be-born children" was unsupported by the findings. The ALO, however, explicitly declined to conclude that Devers-Scott's actions were the legal cause of harms suffered by Devers-Scott's patients or their babies. The conclusion Devers-Scott focuses on, read in light of that disclaimer, is amply supported by the findings and the record: the ALO merely meant to emphasize that Devers-Scott's violations of the midwifery rules and other standards of care were not merely record-keeping or de minimis transgressions, as Devers-Scott has claimed.

¶ 15. First, Devers-Scott argues that the ALO erred in finding that she violated MR 3.15, which requires: (A) that the midwife "establish and maintain a record of the care provided and data gathered for each client," and (B) that "[e]ach client's record must contain ... [a] date for each entry in the prenatal record and the postpartum record, and a date and time for each entry in the labor record." The ALO found that Devers-Scott arrived at Rutland Hospital with an incomplete chart, that she completed the chart the following day based on notes written on scraps of paper and the recollections of herself and her assistant, and that the completed chart was deficient and contained numerous inaccuracies. Devers-Scott does not squarely contest those findings. Instead, she contends that, because the staff at Rutland Hospital never looked at the chart she prepared prior to the delivery, her record-keeping — however deficient it may have been — did not contribute to an adverse outcome. This contention, even if true, does not address the rules. Midwifery rule 3.15 requires that a labor record be maintained but contains no adverse-outcome condition. There is no evidence in the record to dispute the ALO's conclusion that Devers-Scott's labor chart did not meet the requirements set forth in the rule. There were ample findings supported by the record, including Devers-Scott's own admissions, supporting that conclusion. Devers-Scott's assistant also testified that she and Devers-Scott reconstructed the labor chart, largely from memory, the following day. The ALO's conclusion that Devers-Scott violated MR 3.15(8) was not in error.

¶ 16. Second, Devers-Scott argues that the ALO erred in concluding that she violated MR 3.14.3, which requires midwives to transfer patients to the hospital or consult with a physician in certain enumerated situations. She supports this contention by pointing out that fluid discharge is not one of the fourteen triggers for transport specified in the rule. Devers-Scott misapprehends the ALO's conclusion. With respect to the fluid discharge, the ALO did not conclude that Devers-Scott had violated MR 3.14.3, but instead found that Devers-Scott violated 3 V.S.A. § 129a(b)(1): failure to practice competently, evidenced by the performance of unsafe patient care.

¶ 17. The ALO found that A.B. had told Devers-Scott on three separate occasions that she was leaking clear fluid from her vagina, including a gush of fluid on January 17. He also found that, in response to these incidents, Devers-Scott did not consult a physician or conduct tests to determine whether the leak resulted from a rupture of the inner amniotic sac. Devers-Scott admitted that premature full rupture of the membranes can have adverse consequences for the baby and is a

circumstance that necessitates consultation with a physician. In addition, in related findings, the ALO found that Devers-Scott encouraged A.B. to engage in sexual intercourse after the leaking began, on the theory that it might hasten labor, even though the introduction of foreign objects into the vagina can increase the likelihood of infection after the membrane has ruptured. All of these findings are amply supported by the record.

¶ 18. Devers-Scott does not directly contest the ALO's findings about the leaking, her failure to test the liquid, or the potentially serious consequences of an undiagnosed full rupture. She argues, instead, that because the conditions A.B. presented are not explicitly listed as triggers for a physician consultation in midwifery rule 3.14.3, there was no support for the ALO's conclusion that Devers-Scott should have consulted a physician. However, the ALO did not conclude that Devers-Scott violated MR 3.14.3 in this instance. Instead, the ALO concluded that, under the particular circumstances A.B. presented, 3 V.S.A. 129a(b)(1) requires that a midwife, "in the exercise of caution and in providing competent and safe patient care, . . . make the assumption that a full rupture of the amniotic membrane [has] occurred . . . [because t]he risks of making the opposite assumption . . . are simply too high." The ALO further concluded that, in light of these risks, Devers-Scott should not have advised A.B. to have sexual intercourse, and that Devers-Scott should have consulted with a doctor. We find this conclusion reasonable, given the protective purposes of the midwifery statutes, their cautionary language, and the character of the evidence in the record concerning the leaking, the risk of infection, and the adverse consequences of undiagnosed premature rupture.

¶ 19. Third, Devers-Scott contends that the ALO erred in concluding that she violated MR 3.14.3(b), which requires transportation or consultation upon evidence of a nonreassuring fetal heart rate. MR 3.14.3(3). Her position is that the record does not support the ALO's finding that A.B.'s fetus experienced a nonreassuring heart pattern.

¶ 20. The record supports the ALO's finding. The State's expert midwife disputed Devers-Scott's contention that the fetal heart rates were reassuring. After reviewing the evidence, Ryan concluded that the baby was experiencing variable decelerations and that they were nonreassuring because they were not resolved by changing A.B.'s position and administering oxygen. In Ryan's opinion, those factors were serious enough to cause concern and to require transportation or,

at a minimum, consultation with a doctor. The ALO's finding was supported by substantial credible evidence, and the ALO's conclusion that Devers-Scott violated MR 3.14.3(3) was not error.

¶ 21. The ALO also concluded, on the basis of these facts, that Devers-Scott violated 3 V.S.A. § 129a(b), which defines as unprofessional conduct the "performance of unsafe or unacceptable patient ... care" and the "failure to conform to the essential standards of acceptable and prevailing practice." The ALO's conclusion rested on his findings concerning fluid discharge over a period of days; the scant release of fluid when Devers-Scott severed the membranes with an amniohook; the observation of meconium; the baby's unresolved heart decelerations; the baby's lack of descent; the baby's position, which was incompatible with vaginal delivery; and A.B.'s swollen vulva, which indicated that she had been pushing for an extended period of time. Devers-Scott does not contest these findings, and they are supported by the record, as noted above.

¶ 22. Given the ALO's findings, and the additional support in the record, we conclude that the ALO did not err when he concluded that Devers-Scott's conduct during her care of A.B. constituted a "failure to conform to the essential standards of acceptable and prevailing practice," which is unprofessional conduct under 3 V.S.A. § 129a(b).

### Patient L.S.

¶ 23. The facts relating to L.S. are also largely uncontested. In May of 2003, L.S. engaged Devers-Scott to provide midwifery care. She had previously had a cesarean section at Rutland Hospital and was dissatisfied with that experience. She made it clear to Devers-Scott that she did not wish to return to Rutland Hospital. L.S.'s domestic situation was unsettled, and her partner refused to allow her to have the birth at his house. Devers-Scott arranged with a midwife-in-training, Ms. Mulholland, to host the birth at her house in Pittsford, Vermont.

¶ 24. There was some conflicting evidence regarding the specifics of the prenatal care provided: L.S. was due in mid-December of 2003. She attended an appointment at Devers-Scott's office on December 19. Devers-Scott claims that L.S. then abandoned her care by missing the next two scheduled appointments. L.S. claims that Devers-Scott told her that no additional appointments were necessary because she would be going into labor very soon. The ALO did not make a specific finding about the importance of the missed appointments, but Devers-Scott did acknowledge that L.S. was already past her due date at the December 19 appointment. The record shows that, after missing the two sched-

uled appointments in late December, L.S. called Devers-Scott on January 2 and left a message on the answering machine indicating that she was in labor. At that time, L.S. was post-mature, meaning that her pregnancy had exceeded forty-two weeks. Devers-Scott got the message, picked L.S. up at her home, and transported her to the Mulholland residence where L.S. labored for some hours.

¶ 25. Devers-Scott eventually arranged for an ambulance to transport L.S. to Porter Hospital, where doctors delivered her baby by cesarean section. Upon delivery, the attending physician observed very thick meconium in the amniotic cavity, and noted that the umbilical cord and baby were meconium-stained, which indicates that meconium had been present for some time. The ALO found several instances of unprofessional conduct with respect to Devers-Scott's care of L.S. We consider them in turn.

¶ 26. The ALO found, and Devers-Scott concedes, that Devers-Scott committed unprofessional conduct by failing to obtain written informed consent forms from L.S., either for the home birth or for the special risks associated with a vaginal birth after cesarean (VBAC). These forms are required by MR 3.12 and 3.14.2.1(4) respectively. At the merits hearing Devers-Scott conceded that her failure to file them constituted unprofessional conduct. She now contends, however, that she did have oral informed consent from L.S., and dismisses the informed-consent provisions as mere paperwork violations. In contrast, the ALO found that the forms are not a mere formality. The ALO properly concluded that the rule requires a strictly-defined form of written consent for home births after a previous cesarean birth and there was ample support in the record, including Devers-Scott's own admission, that she did not complete or file the form as the rules require. See Appx. A, 9 Code of Vermont Rules 04 030 360-23, 24.

¶ 27. The midwifery model of care, cited by the ALO, is a foundation of the Vermont statutes and rules governing midwifery, and is premised on giving the mother power over the direction of her pregnancy and childbirth. Informed-consent documents are the method, required by rule, to ensure that the mother has received the information necessary to make a reasoned decision. That concept is especially critical in the VBAC context, which entails additional risks and thus requires additional safeguards. See *id.* (requiring prospective VBAC client to affirm that she has "thought about the danger to [her] baby and to [her] of uterine rupture . . . which may result in permanent brain

damage, heavy bleeding, or in the death of [her] baby and/or [her]"). The VBAC informed-consent form also serves to assure prospective clients — and to remind midwives — that the other provisions of the midwifery rules must be complied with at the birth: it requires the client to affirm that "I understand that [my midwife] will be assisted by another licensed midwife and possibly by other health care professionals," that the "[b]irth place will be 30 minutes or less from an operating room" and that "I will complete pre-admission forms prior to my possible transfer to a hospital." *Id.* Devers-Scott was also charged with failing to comply with many of the same rules that the VBAC informed-consent form serves to reinforce, which highlights the substantive importance of the form. We therefore find no error in the ALO's conclusion that Devers-Scott committed unprofessional conduct by failing to obtain L.S.'s written informed consent for the VBAC.

¶ 28. Devers-Scott next argues that the ALO erred when he concluded that her failure to consult with a physician about L.S. violated midwifery rules 3.14.2.1 and 3.14.2(2), and therefore was unprofessional conduct. She supports this argument by claiming that L.S. abandoned her care by failing to appear for scheduled appointments. Because L.S. was no longer her patient, she reasons, she was not responsible for monitoring L.S.'s pregnancy. The first physician-consultation rule, MR 3.14.2.1, states that, with some exceptions not relevant here, "prenatal consultation is advised when available." Given the nonmandatory nature of MR 3.14.2.1, it appears that the ALO was merely citing it in support of his conclusion regarding MR 3.14.2(2). The latter rule mandates consultation where, as here, a woman reaches post-maturity (gestational age greater than forty-two weeks). MR 3.14.2(2). The ALO found that L.S. reached forty-two weeks in late December, and that Devers-Scott neglected to contact a physician between that time and when L.S. gave birth in early January. Devers-Scott does not contest the ALO's finding that L.S. reached post-maturity in late December. Nor does she claim to have made the required consultation. Therefore, the only issue is whether L.S. abandoned her care by missing the appointments, before the period of post-maturity, in late December.

¶ 29. The midwifery rules contain specific provisions governing discontinuation of services. See MR 3.13(F) ("Before refusing or discontinuing service, the midwife must notify the client in writing, provide the client with names of other licensed maternity care practitioners, and offer to provide copies of medical records promptly, regardless of whether copying costs have been paid by the client."). Devers-Scott never informed L.S. that she thought L.S. had abandoned

her care and that Devers-Scott was terminating their relationship, either orally or in writing. According to the record, L.S. last appeared for an appointment on December 19, at which time she was more than forty weeks pregnant, and almost one week past her due date.[2] Devers-Scott then picked L.S. up walking by the side of the road sometime before December 25, but did not inform her at that time that she was terminating L.S.'s care. Sometime between December 25 and January 1, Devers-Scott claims she decided to terminate care and composed a letter informing L.S. of her decision, but never delivered the letter to L.S. When L.S. called on January 2, Devers-Scott did not inform her of the termination and arrange other care, but instead undertook to perform midwifery services. Furthermore, the ALO heard testimony from the State's expert that the proper way to terminate a midwife-client relationship would be to physically find the client and inform her of the situation.

¶ 30. Even if we accepted Devers-Scott's argument that L.S. abandoned the relationship, Devers-Scott also did not take any steps to comply with rule 3.13(F)'s other requirements: providing the client with the names of other care providers and providing copies of medical records to those providers. Given the great weight of the evidence, and the fact that MR 3.13(F) unequivocally requires that a midwife notify a client in writing before terminating service, the ALO did not err in concluding that L.S. was still under Devers-Scott's care until at least January 2. Therefore, the ALO also did not err in concluding that Devers-Scott violated MR 3.14.2(2) by failing to consult with a physician when L.S. reached post-maturity in late December.

¶ 31. Third, Devers-Scott claims that the ALO erred in finding that she violated MR 3.14.2.1(9) and (10), which require that "pre-admission forms . . . be completed for the client before labor, for the

---

[2] Devers-Scott's briefing before this Court repeatedly misstates the record on appeal, stating that L.S. was "about 37.5 weeks" pregnant at the December 19, 2003, appointment and that "the patient had deprived Devers[-Scott] of the opportunity to care for her during the last 4 and one-half weeks of her pregnancy." Devers-Scott's own testimony and records reflect, however, that L.S. was due on December 14, 2003, and was more than forty weeks pregnant at the December 19 appointment with Devers-Scott. L.S. went into labor on January 2, 2004, two weeks after the December 19 appointment, not "4 and one-half weeks" or "several weeks" later, as Devers-Scott's briefing now asserts.

hospital to which the client may possibly be transferred" and that the client's prenatal records be sent to the backup hospital before birth. Devers-Scott first argues that L.S. terminated care by missing two meetings, thereby relieving Devers-Scott of her obligation to submit the pre-admission forms. As discussed above, that argument is unavailing. Second, she claims that L.S.'s refusal to go to the closest hospital and the unsettled nature of L.S.'s planned birthing place made it impossible for her to determine where to deliver the pre-admission forms and prenatal records. But the ALO found that Devers-Scott and L.S. had agreed to go to Porter Hospital in Middlebury, and this finding was supported by Devers-Scott's own admission. Therefore, Devers-Scott could have complied with MR 3.14.2.1(9) and (10) by delivering the pre-admission forms and prenatal records to Porter Hospital. She concedes that she did not do so. Thus, the ALO's determination that Devers-Scott violated MR 3.14.2.1(9) and (10) was not error.

¶ 32. Fourth, Devers-Scott contends that the ALO erred in concluding that she violated MR 3.14.2.1(6), which requires that a home birthing site must be within 30 minutes "transport time" from the backup hospital. Devers-Scott argues that "transport time" should be construed to include only the time it takes the already-loaded ambulance to drive from house to hospital. The ALO construed "transport time" to encompass either: (1) the period beginning with the distress call, through the pickup, and ending when the patient is unloaded at the hospital, regardless of weather or other hindrances, or (2) the time from the ambulance's arrival at the house to the time the ambulance reaches the hospital. Even under the more permissive latter construction, the ALO concluded that Devers-Scott violated the rule by choosing Ms. Mulholland's residence as the birthing site when she knew that L.S. would be transported to the hospital in Middlebury. We review the ALO's construction of the rule de novo. *Supra*, ¶ 9; *Ayala-Chavez*, 945 F.2d at 294.

¶ 33. As this Court has previously stated, "[o]ur primary duty in construing a statute is to discern the intent of the [drafter] by examining the language of the entire statute, along with its purpose, effects, and consequences." *State v. Lussier*, 171 Vt. 19, 23, 757 A.2d 1017, 1020 (2000). "Transport" is defined as "[t]o convey from one place to another." Webster's New University Dictionary 1228 (1984). The VBAC informed-consent form also refers to transport time, requiring that the "[b]irth place will be 30 minutes or less from an operating room." Appx. A, 9 Code of Vermont Rules 04 030 360-23. Neither the

dictionary definition nor the reference in the consent form resolves the question, which is complicated by the fact that an ambulance call requires the ambulance to come from another location to the birthing site before transporting the patient to the hospital.

¶ 34. Where the language in a statute or rule is ambiguous, we turn to the underlying purpose of the rule to guide our interpretation. See *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350 (1943) ("[C]ourts will construe the details of an act in conformity with its dominating general purpose."); *Clymer v. Webster*, 156 Vt. 614, 625, 596 A.2d 905, 912 (1991). The ALO appears to have done so here, concluding that the regulation, "intended for the safety of VBAC clients and their babies, may not be applied in a manner that undermines its protective intentions." The ALO concluded that, at a minimum, the rule should be interpreted to require that the time from the arrival of an ambulance at the house (or, if transporting by car, the time of the decision to transport) to arrival at the hospital, be less than 30 minutes. Further, the ALO noted, the time is not the actual time of transport on any given day, but rather "the reasonably expected time, given what the midwife must reasonably know and/or anticipate about weather conditions, the needs of the client and/or the risks (and prospects for) transport by car rather than via an ambulance call."

¶ 35. Given the protective purposes of the midwifery rules generally, and the VBAC provisions specifically, we conclude that the ALO's interpretation of the rule is essentially correct. It is in accord with the legislative intent underlying the midwifery rules. See MR 1.1, 9 Code of Vermont Rules 04 030 360-2 ("The Director of the [OPR] has been given powers by Vermont law to protect the public health, safety, and welfare by setting standards, licensing applicants, and regulating licensed midwives and their practices."). We take this opportunity to state explicitly that the midwifery rules require that any VBAC home birthing site must be so situated that the reasonably expected time from the arrival of the ambulance at the house (or, if transporting by car, the decision to transport) and arrival at the hospital must be less than thirty minutes. Based on this interpretation of the rule, the ALO concluded that Devers-Scott violated it. He found that under normal circumstances it would take a vehicle, once loaded, an average of twenty-eight minutes to get from the Mulholland residence to Porter Hospital, but that it took forty minutes on January 2 because of slippery winter conditions and time spent engaging the ambulance's

four-wheel drive. He further found that it took about twenty minutes for the ambulance to arrive at the house after the call, and another twenty minutes to load the ambulance. The total time between the ambulance call and L.S.'s arrival at Porter Hospital was therefore eighty-one minutes. Devers-Scott testified that she could have driven from the birthing site to Porter Hospital in fifteen or twenty minutes, but did not do so for fear of hastening labor and necessitating delivery in the car. Notwithstanding this conflicting testimony, there was substantial support in the record for the above findings, which in turn supported the conclusion that Devers-Scott violated MR 3.14.2.1(6). We find no error.

¶ 36. Fifth, Devers-Scott argues that the ALO erred when he found that she violated MR 3.14.2.1(7), which requires that two licensed midwives be present at VBAC births. She again begins by arguing that L.S. abandoned her care, but as noted above, this argument is meritless. Furthermore, Devers-Scott admits that L.S. was under her care during the thirty-seventh week of pregnancy and that she should have arranged by then for a second midwife to be present at the birth. But Devers-Scott argues that the rule only requires two midwives "at birth" and not during labor, and that because delivery took place at the hospital she "did not violate the plain language of this rule." While we need not reach, under these facts, the question of precisely when during the labor-and-delivery process the second midwife must arrive, we reject Devers-Scott's hypertechnical reading. The obvious purpose of the rule is to require that two licensed midwives be present during the birthing process, i.e., during labor and delivery, not simply at the instant that the baby emerges from the birth canal. The circumstances of L.S.'s labor bear out the importance of having a second midwife present: had a second midwife been present to assist with a possible en-route birth, L.S. might have arrived at the hospital significantly sooner than she did, and the assistance of a second midwife could only have enhanced Devers-Scott's ability to keep good records of the care provided, as the rules require.

¶ 37. The ALO found that Devers-Scott made no effort prior to January 2 to get another midwife to assist, despite the passage of months when she thought the birth would occur at the Mulholland residence. Likewise, we observe nothing to suggest that, when she undertook to attend the labor and delivery, Devers-Scott sought help from any licensed midwife. As Devers-Scott does not contest the finding that she violated the rule, but only claims that the violation should be excused either because of the assertedly emergent circum-

stances of the birth, or based on her erroneous construction of the rule, we discern no error in the ALO's conclusion that the violation did occur.

¶ 38. Sixth, Devers-Scott contends that the ALO erred in concluding that Devers-Scott committed unprofessional conduct by failing to transfer L.S. promptly to the backup hospital. The ALO concluded that Devers-Scott should have initiated transport either immediately upon being contacted by L.S. on January 2, or later that day as soon as she saw any sign of meconium or elevated heart rate (tachycardia). Devers-Scott argues that none of the conditions found to be present by the ALO required immediate transfer of L.S. to a hospital. Midwifery rule 3.14.3 lists conditions which require immediate transfer or, if transfer is not possible, consultation with a doctor. Of the enumerated conditions, two are relevant here: (3) nonreassuring fetal heart rate, and (14) gross or thick meconium staining. Devers-Scott claims that she arranged for transport as soon as she became aware of the meconium and the accelerated heart rate. MR 3.14.3. She also claims that the elevated fetal heart rates she recorded did not require transport because MR 3.14.3(3) requires transport only upon observation of a "[n]on-reassuring fetal heart rate or pattern" and only when that pattern persists for a longer time than the elevated heart rates did in the present case.

¶ 39. In contrast, the ALO found that both conditions were present for a substantial period of time before Devers-Scott arranged for transportation. There is substantial evidence in the record supporting his findings, and those findings support his conclusion. A witness testified to observing a "gush" of thick meconium coming out of L.S.'s vagina between 5:00 p.m. and 6:00 p.m. Devers-Scott noted in the labor and delivery record that there was meconium at 6:30, but later characterized it as "clear to thin if even tinged fluid." During the cesarean section at Porter, the attending doctor observed thick meconium at the entry to the amniotic cavity and meconium staining of the placenta and umbilical cord. There was testimony that such staining typically indicates that meconium has been present in the amniotic fluid for eighteen to twenty-four hours. The attending doctor at the birth did not see any visible meconium when performing an initial vaginal examination, however. Devers-Scott claims that she decided to transport at 6:30, between thirty and ninety minutes after Mulholland observed the meconium. However, the emergency medical service's records reflect that Devers-Scott did not call them until 7:04 p.m.

¶ 40. Likewise, the ALO found that the fetal heart rate exceeded 160, which is tachycardic, for approximately ninety minutes before Devers-Scott called an ambulance. Tachycardia is one of the nonreassuring fetal heart conditions listed in MR 3.14.3(3) that require the midwife to facilitate transfer or consult a doctor. There is evidence in the record that the fetal heart rate exceeded 160 for at least ninety minutes before Devers-Scott called for transport. The labor-and-delivery record contains entries at fifteen-minute intervals; the recorded heart rates were between 136 and 146 beats per minute (bpm) until 5:15 p.m., at which time the recorded rate increased to 158 bpm. The rate then increased to 162 bpm at 5:30, and remained above 160 until Devers-Scott stopped recording at 6:30. The ambulance call was made at approximately 7:04 p.m. The evidence therefore suggests that between 90 and 105 minutes elapsed between the onset of tachycardia and the ambulance call. An expert midwife testified that such a prolonged rise in heart rate would be of great concern, and that transport should have been arranged earlier. As noted above, there was also substantial evidence in the record supporting the conclusion that there was sufficient meconium present to require earlier transport. Thus, the ALO did not err when he found that Devers-Scott violated MR 3.14.3(3) and 3.14.3(14).

¶ 41. Seventh, Devers-Scott contends that she should be excused from compliance with the transfer requirements in MR 3.14.3 because L.S. abandoned her care after the December 19 appointment. Because the ALO was correct in concluding that L.S. was still Devers-Scott's patient until January 2, however, this contention provides no basis for excusing Devers-Scott from the transfer requirements. Finally, Devers-Scott would have us find error in the ALO's conclusion that she should have arranged to transport L.S. sooner because L.S. had a "higher-risk or potentially more complicated" pregnancy triggering the general transport provision of MR 3.14.3. In light of our conclusion that the ALO was correct in concluding that Devers-Scott committed unprofessional conduct by failing to transport in timely response to the meconium and tachycardia, however, we need not reach this question.

¶ 42. Devers-Scott does not dispute the ALO's finding that she violated MR 3.15, which requires that a midwife "establish and maintain a record of the care provided and data gathered for each client." The ALO found that information regarding both fetal heart tones — as required by MR 3.14.2.1(5) — and L.S.'s consent to the rupturing of her membranes was missing from the labor record. There was substantial support in the record for these findings.

¶ 43. We also find no error in the ALO's conclusion that Devers-Scott violated MR 3.14.2(2), which requires that, when a patient has reached a gestational age of forty-two weeks and is therefore deemed post-mature, the midwife "must consult with a licensed M.D. or D.O., must document such consultation and the consultant's recommendations, and must document discussion of the consultation with the client." The ALO found that L.S. reached postmaturity in late December and that Devers-Scott did not call a physician at that time. Apart from her general contention that her violation of this rule is excused by L.S.'s purported abandonment of Devers-Scott's care, Devers-Scott does not contest these findings. As noted above, the abandonment argument fails, and we therefore find no error.

### Patient K.B.

¶ 44. In late 2002, K.B. engaged Devers-Scott to provide midwifery services for the birth of her child. At that time, K.B. lived in Cohoes, New York. The arrangement, as K.B. understood it, was that she would have a home birth, and that Devers-Scott would be in attendance. Devers-Scott was not licensed to practice midwifery in New York, nor has she ever been. During the months leading up to the delivery, Devers-Scott made one visit to K.B.'s home in New York. K.B. also took some herbs in New York, on Devers-Scott's advice, in February 2003. K.B. traveled to Devers-Scott's office in Vermont for all of the other consultations. K.B. also entered into an agreement with Devers-Scott to rent a birthing tub. The rental agreement indicated that the tub would be used at K.B.'s home in New York.

¶ 45. Devers-Scott contends that the birth location was unsettled until the time K.B. decided not to continue in Devers-Scott's care. On February 17, 2003, K.B. began early labor and called Devers-Scott to request delivery of the birthing tub (which was then being used by another woman). About fifteen minutes later, K.B. received a call back from Devers-Scott. During this conversation, Devers-Scott informed K.B. that she was terminating her midwifery care. She did not provide K.B. with the names of other midwives. K.B. then arranged with another midwife she had used previously in Vermont to attend her labor and delivery at the hospital in Bennington, Vermont. Devers-Scott faxed K.B.'s records to the new midwife the next morning. After her labor did not progress, K.B. delivered her baby by cesarean section later that month.

¶ 46. The ALO concluded that Devers-Scott committed unprofessional conduct by practicing midwifery without a license in New York and by improperly terminating K.B.'s care. Devers-Scott first challenges the ALO's finding that she violated the unprofessional conduct statutes by practicing midwifery without a license in New York. 3 V.S.A. § 129a(a)(3). She contends that: (1) there was no evidence that she ever held herself out to practice midwifery in New York; (2) she and K.B. discussed the possibility of having the birth at Devers-Scott's house in Vermont; and (3) K.B.'s birth ultimately did take place in Vermont, albeit under the supervision of a different medical team. In contrast, the ALO found that Devers-Scott was not licensed to practice midwifery in New York and that she "engaged in midwifery practice and referred to herself as a midwife in New York." He also found that New York law in 2003 required any person practicing midwifery or using the title "midwife" in New York to be licensed or exempt from licensing. N.Y. Educ. Law § 6952 (2006) ("Only a person licensed or exempt under this article or authorized by any other section of law shall practice midwifery."); *id.* § 6953 ("Only a person licensed or exempt under this article shall use the title 'midwife.'"). Devers-Scott was not exempt from licensing in New York. See *id.* § 6957 (exempting physicians and supervised medical and midwifery students from the licensing requirement). Vermont law provides that practicing midwifery in violation of any state or federal statute shall constitute unprofessional conduct. 3 V.S.A. § 129a(a)(3).

¶ 47. Once again, we find that the record supports the ALO's findings. The midwifery regulations address prenatal care, not merely procedures for labor and delivery. Therefore, evidence of Devers-Scott's visit to K.B.'s home in New York, which included taking K.B.'s blood pressure and fetal heart tones, supports the ALO's finding that Devers-Scott practiced midwifery in New York in violation of New York law. The ALO's finding is further buttressed by K.B.'s testimony that she was under the impression that the birth would occur at her home in New York, and by the contract for the birthing tub, which included a provision that the tub was to be used in K.B.'s home in New York. There is ample evidence that Devers-Scott practiced midwifery in New York in violation of New York law, and the ALO correctly interpreted the law to bar unlicensed prenatal midwifery care. Therefore, the ALO's conclusion that she violated 3 V.S.A. § 129a(a)(3) was not in error.

¶ 48. Devers-Scott next disputes the ALO's conclusion that she violated MR 3.13(F) when she terminated K.B.'s care. That rule

requires that a midwife, before she terminates care, "notify the client in writing, provide the client with names of other licensed maternity care practitioners, and offer to provide copies of medical records promptly." The ALO found that Devers-Scott terminated K.B.'s midwifery care over the phone on February 17, 2003, and that she did not provide the names of other midwives. He also found that K.B. was in labor, probably early labor, at that time. Devers-Scott does not contest the ALO's finding that she terminated care over the phone, and does not claim to have provided the names of alternate care providers, but argues that K.B. relieved her of those responsibilities by preemptively selecting another care provider herself. We do not agree.

¶ 49. Midwifery rule 3.13(F) requires that, "*[b]efore* refusing or discontinuing service, the midwife must notify the client in writing." (Emphasis added.) The record supports the ALO's finding that Devers-Scott failed to notify K.B. of the termination in writing before terminating care. Likewise, K.B.'s proactive choice of a new care provider does not excuse Devers-Scott's failure to provide K.B. with the names of other care providers, particularly given that K.B. was already experiencing early labor and thus needed to make other arrangements quickly. Had Devers-Scott complied with the rule, this task would have been accomplished more directly. The ALO's determination that Devers-Scott violated MR 3.13(F) was not error.

¶ 50. Devers-Scott next argues that the ALO erred in his conclusion that she violated MR 3.14.3, which states that "[i]f birth is imminent, the midwife must not leave until the ambulance has arrived." Devers-Scott's position is that the rule did not apply because birth was not imminent; as she points out, over this interval, K.B. was twice sent home from the hospital and did not give birth until more than a week later. We disagree. The ALO found that once labor commences, the birth of a child is imminent for purposes of MR 3.14.3. He based this finding on testimony by one of the State's midwifery experts, Ruth Richardson. The actual date of K.B.'s eventual delivery is not determinative of when birth was "imminent" for purposes of MR 3.14.3. The record supports the ALO's finding that it is not possible to predict in advance the interval between the onset of labor and the delivery of the baby and that the interpretation of the word "imminent" must account for that uncertainty. Therefore we cannot say that the ALO incorrectly construed the rule when he concluded that birth is imminent and

triggers the requirements of MR 3.14.3 once labor commences. The ALO's finding that Devers-Scott violated MR 3.14.3 was not error.

## The Sanction

¶ 51. Pursuant to 3 V.S.A. § 129, sanctions may be imposed on a midwife for unprofessional conduct. Section 129(a)(3) allows the board or ALO to "revoke, limit, condition or prevent renewal of licenses" either permanently after a full hearing or temporarily after a summary suspension hearing. Devers-Scott's license was permanently revoked by the ALO, and the revocation was affirmed by the superior court.[3]

¶ 52. Devers-Scott's basic complaint is that the nature of her violations do not justify the ALO's choice of sanction. She first argues that her "actions and omissions did not violate the midwifery rules except with regard to record keeping." However, as detailed above, Devers-Scott committed numerous violations, of both record-keeping and other rules and statutes. Additionally, Devers-Scott is mistaken in her belief that the record-keeping statutes and rules are less significant than other statutes and rules. The structure of the midwifery regulatory regime, and the ALO's findings, clearly demonstrate that diligent and accurate record-keeping and data-sharing are crucial to the safety of patients and to the legitimacy of midwifery practice. Dismissing the record-keeping requirements as merely ministerial ignores their underlying purposes.

¶ 53. To cite one example, during her care of L.S., Devers-Scott violated MR 3.14.2.1(10), which requires transmission of prenatal records to the backup health center before labor in VBAC cases. This rule, although it involves the transmission of records, was plainly drafted to ensure that emergency caregivers have the information necessary to providing the best possible care under rapidly changing and emergent circumstances requiring immediate action, such as those present in the case of L.S. The remainder of the record-keeping rules, similarly, impose record-keeping requirements on midwives in the service of the broader purposes of the rules, such as empowering mothers to make informed decisions about the direction of their care.

¶ 54. Devers-Scott makes two further arguments against the license revocation. First, she claims that her sanction was disproportionate to the sanction in *In re Luce*, Case No. 01-9001 (2003), in which she asserts the violations were more serious. Second, Devers-Scott

---

[3] Devers-Scott's license was first temporarily suspended after the summary suspension hearing, which is not the subject of this appeal.

continues to press the argument that L.S. "abandoned [Devers-Scott's] care," thereby releasing Devers-Scott from continued compliance with the law with respect to L.S.'s care and undermining the ALO's authority to revoke Devers-Scott's license. That argument remains unavailing. Similarly, the facts in *Luce* are not helpful to Devers-Scott. In *Luce*, the midwife admitted to committing unprofessional conduct by allowing her client to labor for eighteen hours without progress, neglecting to address various physical manifestations of client distress, and failing to test for preeclampsia. The midwife in *Luce* agreed to waive her right to a hearing before an ALO in exchange for her acceptance of peer supervision for ten births, retraining, and remedial study.

¶ 55. *Luce* is not persuasive for three reasons. First, *Luce* involved three instances of unprofessional conduct with a single patient. Devers-Scott's case comprises many more instances involving three patients. Second, and more important, the procedural posture of *Luce* is quite different from the case at bar. The State agreed to the *Luce* stipulations before an ALO made any findings. Therefore, there is no record of the facts on which the choice of sanction was based in *Luce*. A stipulated consent order is not persuasive precedent for a contested case such as this one. We have held as much in an analogous criminal context. *State v. Davis*, 155 Vt. 417, 420, 584 A.2d 1146, 1147 (1990) (stating that plea-bargained and judge-determined sentences cannot be compared). Third, and most important, this Court has long held that in regard to professional conduct decisions, "each case must be resolved in the light of all its own circumstances and, except in the broadest sorts of policy concerns, there is no precedential value as between cases." *In re Harrington*, 134 Vt. 549, 552, 367 A.2d 161, 163 (1976). Courts from other jurisdictions have reached similar conclusions with respect to professional license sanctions. See *Aldrete v. Dep't of Health Bd. of Med.*, 879 So. 2d 1244, 1246-47 (Fla. Dist. Ct. App. 2004) ("Penalty imposition is a complex task .... Ultimately, the decision rests within the Board's sound discretion. We cannot say on appeal that [the physician's] penalty was excessive based on the allegation that others, in [the physician's] opinion, received more favorable treatment.") (citations omitted). Although we will not defer to sanction determinations by nonexpert ALOs, to the same extent as we do to those imposed by expert boards, even that more searching review reveals no error here.

¶ 56. Devers-Scott also contends that the ALO erred by taking her troubled relationship with physicians and her demeanor into account in his consideration of sanction. The ALO's order does characterize Devers-Scott's "approach to the accusations against her" as giving rise to "questions about her forthrightness in dealings with clients and others in the health care profession." The ALO noted that Devers-Scott "denied many of the allegations in technical terms; . . . sought to blame clients or the obstetrical profession for [her own behaviors]" and concluded that, "in [his] view, her demeanor did not evidence a professional who was willing to accept responsibility for her actions." On review of the hearing transcripts, we note that there is ample support for these characterizations; Devers-Scott evinced little appreciation for the serious nature of her acts and omissions, and repeatedly sought to deflect blame onto her clients and others. These are proper considerations in determining sanctions in this case, as they are in the criminal context. See *State v. Sims*, 158 Vt. 173, 188-89, 608 A.2d 1149, 1158 (1991). Further, even if there were no support for the ALO's findings concerning Devers-Scott's attitude, the ALO's choice of sanction is abundantly supported by Devers-Scott's repeated failure to comply with the statutes and rules governing her profession.

¶ 57. Devers-Scott next argues that, because the statute does not contain guidelines for the imposition of sanctions, the ALO's decision is necessarily arbitrary. We disagree. The plain language of the unprofessional conduct statutes makes clear that the Legislature intended to leave the determination of the appropriate sanction to the discretion of the ALO. See 26 V.S.A. § 4188(c) ("After a hearing, and upon a finding of unprofessional conduct, an [ALO] may take disciplinary action against a licensed midwife or applicant."); 3 V.S.A. § 129(j) (ALO to hear disciplinary matters involving midwives and other professionals governed by advisor appointees); *id.* § 129(a)(3) (board or ALO may "suspend, revoke, limit, condition or prevent renewal of licenses"). The Legislature explicitly contemplated that, in appropriate cases, an ALO might revoke a midwife's license.

¶ 58. Devers-Scott's citation of *In re Taylor*, in which we upheld a six-month license suspension for an attorney whose repeated failures to pay child support resulted in a misdemeanor conviction for nonsupport, is inapposite. 171 Vt. 640, 641, 768 A.2d 1273, 1275 (2000) (mem.). To the limited extent that any attorney-misconduct case could inform our analysis of the ALO's sanction here, *Taylor* is not that case. The respondent in *Taylor* committed acts that did not directly involve his

clients, in contrast to Devers-Scott's actions, which not only involved patients but directly and detrimentally affected the care they received.

¶ 59. Finally, Devers-Scott claims that the ALO's decision denied her due process because she received no notice that the ALO would take her demeanor into account in his consideration of sanction. This contention is without merit. It is true that due process requires that a defendant receive notice of the charges against her. In this case, however, Devers-Scott admits that she did have notice that the OPR was charging her with violations of the unprofessional conduct statutes and the midwifery rules. She cites no case in which we required a judge or administrative agency to notify the defendant of every factor that might be taken into account in determining a discretionary sanction. In fact, we require only that a defendant has notice of the evidence and an opportunity to rebut. See *Perry-Hooker*, 139 Vt. at 269, 427 A.2d at 1336-37 ("[T]he appellant should have the opportunity to produce any evidence relevant to the issue of what sanction should be imposed."). All of the evidence on which the ALO based his decision was presented in open hearings, and Devers-Scott does not contend that she was denied an opportunity to contest it. Therefore, the ALO did not violate Devers-Scott's due process rights in his imposition of sanction.

¶ 60. In sum, the record not only substantially supports, but virtually compels, the conclusion that Devers-Scott repeatedly engaged in unprofessional conduct and provided substandard care to her patients. There is ample credible support in the record for the ALO's further conclusion that Devers-Scott's approach to the accusations itself raised doubts about her future ability to comply with the midwifery rules, the reach of which she has consistently sought to escape through hypertechnical constructions at odds with the rules' protective purposes. The sanction imposed was rationally devised to further the state's interest in protecting the health and safety of expectant mothers and unborn children. Thus, we conclude that the revocation of Devers-Scott's license was an appropriate exercise of the ALO's discretion.

*Affirmed.*